John C. BALSHY, Petitioner

v.

**PENNSYLVANIA STATE POLICE and Office of General Counsel, Respondents.**

Janice Roadcap, Petitioner

v.

**Office of General Counsel and Pennsylvania State Police, Respondents.**

Commonwealth Court of Pennsylvania.

Argued Dec. 9, 2009.

Decided Feb. 8, 2010.

Christopher J. Coyle, Lebanon, for petitioner, John C. Balshy.

Linda J. Olsen, Harrisburg, for petitioner, Janice Roadcap.

Susan E. Malie, Deputy General Counsel, Harrisburg, for respondent, Office of General Counsel.

BEFORE: LEADBETTER, President Judge, and PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge, and BUTLER, Judge.

OPINION BY Judge SIMPSON.

In these consolidated appeals, former Pennsylvania State Police (PSP) Corporal John C. Balshy (Balshy) and former PSP Chemist Janice Roadcap (Roadcap) petition for review from an order of the Office of General Counsel (OGC) that denied their requests for indemnification and reimbursement of legal fees and costs associated with their defense in an underlying federal suit filed against them by Steven Crawford (Crawford). OGC denied the requests based on its determinations that Balshy and Roadcap acted maliciously, outside the scope of their employment and in bad faith. In particular, OGC determined Balshy and Roadcap, individually or while acting in concert, misrepresented the results of Roadcap's analysis of palm print evidence collected in connection with the murder investigation and criminal prosecution of Crawford; failed to fully disclose the results of Roadcap's palm print analysis to the prosecution and the defense in the criminal proceedings against Crawford; and, provided misleading testimony during three separate criminal trials of Crawford.

On appeal, Balshy and Roadcap contend OGC's determinations that they acted maliciously, outside the scope of their employment, and in bad faith, are not supported by substantial evidence. In addition, a threshold issue exists as to whether OGC enjoyed jurisdiction over Balshy and Roadcap's reimbursement requests. Upon review, we conclude OGC properly exercised jurisdiction over the requests for reimbursement and properly denied those requests on the merits. Therefore, we affirm OGC's decision.

### I. Procedural Background

Through the complaint filed in the underlying federal civil rights action, Plaintiff Crawford advanced claims against Balshy and Roadcap pursuant to 42 U.S.C. §§ 1983 ("Civil action for deprivation of rights"), 1985 ("Conspiracy to interfere with civil rights") and 1986 ("Action for neglect to prevent"). Crawford alleged, among other things, Balshy and Roadcap engaged in conduct violative of Crawford's Fourth and Fourteenth Amendment rights. Specifically Crawford alleged Balshy and Roadcap "maliciously conspired" to commit acts of fraud, deceit, falsification of testimony, fabrication, alteration, adulteration and/or concealment of exculpatory evidence in order to wrongfully convict Crawford of criminal homicide. The complaint includes separate counts of "fraud," "false imprisonment," "intentional infliction of emotional distress," and "conspiracy." Reproduced Record (R.R.) at 226a–231a. Crawford alleged these acts were committed on the basis of Crawford's race and Balshy and Roadcap acted with "wanton" and "reckless disregard." R.R. at 230a.

Shortly after service of the complaint in the underlying action, PSP Chief Counsel Barbara L. Christie notified Roadcap and Balshy the Commonwealth would not be providing them with defense counsel in the federal suit, and the Commonwealth would not indemnify them for any judgment entered against them or pay or indemnify them for the expense of settlement of the suit. At that time, both Balshy and Roadcap retained separate, private counsel.

Upon settlement of the underlying action for $1.2 million, Balshy, through counsel, formally made his demand of the Commonwealth for reimbursement of legal fees totaling $107,385.85. In addition, Roadcap, through counsel, sought reimbursement of $178,156.40 in legal fees and costs. PSP Chief Counsel Christie denied these requests.

Shortly thereafter, Balshy and Roadcap filed separate appeals from Chief Counsel

Christie's denials. OGC's Deputy General Counsel Linda C. Barrett denied these appeals on the grounds Balshy and Roadcap acted maliciously, in bad faith or outside the scope of their employment. Balshy and Roadcap again appealed, and the appeals were consolidated for hearing before Hearing Officer Jackie Lutz, Esq. on the issue of whether Balshy and Roadcap's conduct was a bad faith exercise of their authority, malicious or outside the scope of their employment such that they were not entitled to reimbursement of reasonable attorney's fees and expenses. Hearing Officer Lutz conducted a hearing in these matters in April 2007. The record was subsequently certified and submitted to OGC.

## II. Factual Background

Ultimately, General Counsel Barbara Adams issued a thoughtful and thorough opinion, containing a 20–page discussion of the complex factual background as well as 14 pages of "Findings of Fact, Conclusions of Law and Analysis." OGC's opinion is summarized below.

### A. Investigation of the Murder of John Eddie Mitchell

In September 1970, Harrisburg Police discovered the body of 13 year-old John Eddie Mitchell in a detached garage owned by the family of 14 year-old Steven Crawford. It was determined the cause of the Mitchell's death was blunt force trauma to his head.

Parked inside the garage and adjacent to Mitchell's body was a Pontiac Station Wagon owned by the Crawford family. During the course of the investigation, police discovered what appeared to be blood spatter on the left rear door of the Pontiac. Police investigators processed this portion of the vehicle and were able to lift seven latent finger prints and/or palm prints, of which three partial palm prints matched impressions obtained from Crawford. At least one print had a substance on it that police suspected might be Mitchell's blood.

Then—Corporal Balshy and Walton Simpson,[1] who at all times during the investigation served as either a City of Harrisburg police sergeant or a Dauphin County Detective, were two of the officers assigned to investigate the Mitchell case. Balshy and Simpson delivered the partial print to the PSP Laboratory for analysis.

At the time of the investigation, which occurred between 1972 and 1974, PSP chemists engaged in a practice that typically included conducting three separate tests to verify whether a substance detected on evidence constituted human blood. When the evidence was located on a print, i.e., finger, palm or foot, the chemist typically documented precisely where on the print the substance was located. Prints include two separate surfaces: the "ridges" of the print where the skin is raised and the "valleys," or depressed skin between the ridges of the print.

The first test involved dropping a benzidine reagent onto the substance. If the reagent yielded negative results for peroxidase activity, the chemist would conclude no blood was present and no further tests would be conducted. However, if the benzidine caused positive peroxidase activity, a reaction noted by a bright blue hue, the particles could fall within a set of possible substances, including chemicals such as potassium dichromate and potassium permanganate, vegetable juices like carrot juice or potato juice, dried vegetable extracts, leather or blood. Thus, further testing would be required to confirm whether the substance was in fact blood.

---

1. The late Sgt. Walton Simpson was not related to Judge Robert Simpson.

The second test, the "Takayama test," involved more advanced chemical testing to confirm whether the substance was in fact blood. However, this test did not distinguish between human blood and the blood of an animal. If the substance was determined to be blood, a third test was then performed to establish whether the blood originated from a human source.

On November 29, 1972, Roadcap, a chemist and serologist employed by the PSP, analyzed the palm print taken from the Mitchell crime scene at the request of Balshy. Roadcap was not a fingerprint expert. Roadcap "also emphasize[d] that this may have been one of the very few times she ever received print evidence." OGC Op. at 9.

Balshy presented Roadcap with a tri-sheet carbon copy form reflecting certain typewritten information such as the victim's name, the date, the location, the incident number, Balshy's signature as the requester of the analysis, what type of test Balshy requested and other general information identifying and describing the item of evidence. The following descriptor was also typewritten onto the form "Blood Analysis of a Latent Fingerprint Lift." OGC Op. at 10.

On November 29, 1972, Roadcap conducted the first test while Balshy and Simpson were in the laboratory room. Roadcap asked Balshy how much of the print she could use for testing purposes as the print would be destroyed once subject to testing. Balshy instructed Roadcap to refrain from using the entire print, so Roadcap cut three small strips from the print for her use. Further,

> [Roadcap] allowed Balshy and Simpson to remain in the testing room as she performed the preliminary benzidine test on all three of the strips. Roadcap permitted Balshy to view the results of the benzidine test under the microscope.

(Vol. II, Ex. D, p. 49) She states that Balshy would have seen precisely what she viewed under the microscope. (Vol. IV, Tab d, p. 69)

Roadcap concluded that the print tested positive for benzidine, which could represent the presence of blood. She recalls viewing a "very intense blue color" under the microscope. (Vol. II, Tab 9, Ex. G, pp. 667) Balshy admits having viewed this same reaction under the microscope. (Vol. IV, Tab g, pp. 712 & 716)

OGC Op. at 10.

Roadcap explained that as each event occurred during her analysis, she recorded handwritten notes. After concluding the benzidine test, she handwrote the following observations on the carbon copy paper:

> 6. [Positive] reaction was obtained from the reaction of reagents and the fingerprint powder.
>
> 7. This reaction was greater along the ridges of the fingerprint, however, **numerous particles in the valleys also gave positive reactions.**

OGC Op. at 11 (emphasis in original).

Further, in the "remarks" section of the report, Roadcap appears to have originally written: "A positive reaction was obtained with Benzidine reagent. This indicates the presence of blood in the fingerprint impression." OGC Op. at 11. However, Roadcap modified the report by crossing out the words "in the fingerprint impression" and adding additional language so that the second sentence ultimately reads: "This indicates the presence of blood deposited by the donor of the fingerprint impression." *Id.*

Thus, while the original language seems to render a conclusion very narrowly limited to whether blood exists in the impression, the revised second sentence alters this conclusion and adds the very distinct

and very specific conclusion that the donor actually deposited the blood onto the surface from which the print was lifted. Roadcap insists she was expected to give the latter opinion despite the fact that no one asked her to do so and that she has no recollection of ever rendering such an opinion before or since.

Further, sometime during the testing and initial reporting process, Roadcap again altered her original notes by using a different editing technique of completely crossing out with a black magic marker the following language: "greater," "finger," and "however, numerous particles in the valleys also gave positive results." She then inserted new remarks which read in significant part: "**This reaction was only along the ridges of the print pattern.**" OGC Op. at 12 (emphasis in original).

Of critical note, any reference to Roadcap's original observation that "numerous particles in the valleys also gave positive reactions," was completely obliterated from the report.

The official typewritten report reflecting the conclusions of the benzidine test reads as follows:

When the palm print impression was treated with benzidine reagent a positive impression was obtained.

This indicates the presence of blood deposited by the donor of the palm print.

OGC Op. at 12. The report is dated November 29, 1972. Roadcap admits no further tests were conducted on the print in 1972; thus, the above conclusions were based exclusively on the results of the benzidine test.

A second report dated September 6, 1974, reflects that it was not until two years later that Roadcap performed the more precise Takayama test to confirm the substance was blood. However, long before she conducted the Takayama test, Roadcap modified her lab notes.

The copy that was made available by Roadcap for use at trial by all parties, the court and experts, was the obliterated copy. The original, un-obliterated copy was not made available. In fact, Roadcap claims she never shared the un-obliterated version with anyone and she never discussed its contents with anyone. All three carbon copies of Roadcap's original, un-obliterated notes were reportedly "lost" at some point during the investigation. OGC Op. at 13.

## B. Criminal Prosecutions of Crawford

Two years later, Crawford was arrested and charged with murder. OGC's opinion details the substance of the testimony presented by Roadcap and Balshy during the course of the initial homicide trial and the two subsequent re-trials of Crawford. As stated by OGC, "Balshy's fingerprint expertise and Roadcap's laboratory findings were crucial to the Commonwealth's placement of . . . Crawford at the scene of the crime when Mitchell was murdered." OGC Op. at 13.

Specifically, the medium of transfer was the key piece of information in the case because, as the prosecution argued, the finding of blood originating on the palm print and then being deposited onto the vehicle could place the depositor (Crawford) at the crime scene during or immediately after the murder occurred. The Commonwealth had evidence in its possession that would have placed Crawford in his family garage on any given day; however, palm print evidence revealing Crawford deposited the victim's blood on the Crawford vehicle would place Crawford in the garage at the time of the murder. If the blood had been transferred onto the print in a different manner, for instance, if Crawford's print was deposited onto the

vehicle at an earlier date and *then* the victim's blood transferred onto the print at a later date, or if Crawford put his hand on blood already on the car, Crawford could have been present either before or after the murder, but not necessarily *during* the murder.

Based on expert testimony, the presence of blood exclusively on the ridges supports the conclusion that Crawford was at the scene at the time of the murder. On the other hand, the presence of blood in both the ridges and valleys could support the conclusion the blood was transferred onto the print in another fashion and Crawford's print was not necessarily applied during the course of the murder.

### C. Criminal Trial # 1

At Crawford's first criminal trial, on direct-examination Roadcap testified she observed "brownish-red particles" on the ridges of the print, the location of which "indicated that if the particles were blood, they would have had to be deposited there when the [palm print] was deposited." When asked how she was able to make that conclusion, Roadcap testified, under oath, "**I came to that conclusion because of the fact there were no[ ] . . . suspected blood particles in the valleys of the print. It followed only the ridges.**" OGC Op. at 14 (emphasis in original).

In his testimony, Balshy admitted to having looked through the microscope during initial analysis of the fingerprint evidence in 1972. Balshy testified he looked through a microscope at the bloody partial palm print and saw "a reddish-brown" substance along "the papillary ridges" of the print. When asked whether he saw any reddish-brown substance along the valleys of the print, Balshy responded, under oath, "**No, sir, I did not.**" OGC Op. at 14 (emphasis in original). Balshy also testified: "Because the blood as a result of my

examination the reddish-brown particles appeared to be in the—all in the ridge areas." *Id.* Of note, over the course of his career, Balshy had been qualified as an expert in lifting and identifying fingerprints. In addition, Balshy was specifically offered by the prosecution to provide testimony on the method by which the print was transferred onto the car.

In the Complaint in the underlying civil action, Crawford emphasizes the significance of this evidence:

65. The extent to which the suppressed evidence undermined the truth determining process is apparent from a review of the Supreme Court opinion reversing Mr. Crawford's first conviction in which the Court said:

The prosecution's expert witness testified that this blood was on the hand when it left the print on the car. This witness also testified that, in his opinion, the three partial palmprints identified as belonging to [Crawford] were placed on the car at the time of the killing. No other evidence was produced to establish that [Crawford] was inside the garage at the time of the killing.

OGC Op. at 15 (citation omitted).

Ultimately, Crawford was found guilty of homicide and sentenced to serve life in prison. Crawford's conviction was later overturned and he was granted a new trial, which commenced in February 1977.

### D. Criminal Trial # 2

At Crawford's second trial, Roadcap testified she performed the benzidine test on November 29, 1972, at which time she observed "along the ridge area . . . there were . . . reddish particles which resembled blood in appearance. . . ." OGC Op. at 15. She went on to testify that Sgt. Simpson and an assistant district attorney brought her a new sample of the palm

print on September 4, 1974, at which time she performed additional tests and confirmed the substance was blood. Once again, Roadcap made no mention of her initial discovery of blood in the valleys of the print.

At the time of the second trial, Balshy was the supervisor of the PSP's latent print section in Harrisburg. Balshy again admitted to having personally viewed the print under Roadcap's microscope and testified under oath blood particles were found "only in the ridge area, **not in the valley area of the particular print.**" OGC Op. at 16 (emphasis added). OGC explained:

> Again, Balshy was fully aware of the significance of this conclusion, "The significance then would be that these particles must have been on the ridges of the finger when the print was transferred from the finger to the surface that was touched." (Vol. IV, Ex. F, pp. 379) When asked what impact a discovery of blood in the valleys would have on his opinion of the medium of transfer, he answered, "Then it is possible that the blood could have been on the car."

OGC Op. at 16. Of note, Balshy further testified he viewed the prints under a microscope before he delivered them and viewed them a second time with Roadcap. Balshy ultimately concluded, based on his representations as to the location of blood on the print: "It is my opinion that there was blood on the hand when it came into contact with the car." *Id.*

Ultimately, Crawford was again convicted of murder and sentenced to life in prison; however, his conviction was again overturned and a third trial occurred in February 1978.

### E. Criminal Trial # 3

The third trial followed the general path of the previous two trials; Roadcap testi-fied she found blood-like particles only along the ridges of the fingerprint:

> Q. Did you observe any of these red particles in the valleys of the Exhibit?
>
> A. No, I didn't. **At all times, it followed along where the fingerprint powder was which was on the ridges of the fingerprint.**

OGC Op. at 16 (emphasis in original).

Balshy again testified when he viewed the print under a microscope, he **"didn't observe any [red particles] in the valleys."** OGC Op. at 17 (emphasis in original). Balshy provided what amounted to expert testimony in the third trial concerning the medium of transfer. Notably, the most critical conclusions reached by Balshy were based on his own analysis of what he himself observed under the microscope, i.e., he did not emphasize conclusions reached by Roadcap.

The third trial resulted in a third conviction for murder and a sentence of life in prison.

### F. Discovery of Roadcap's Original, Un–Obliterated Notes

In 2001, approximately 23 years after Crawford's third conviction, while out playing, some children randomly came across a briefcase placed out in front of the home of the late Sgt. Simpson for garbage collection. Inside the briefcase was a photocopy of the original, un-obliterated version of Roadcap's lab notes. The document was turned into the Dauphin County Public Defender's Office, and that office began to raise questions surrounding Roadcap's motive for amending her laboratory notes to the extent they appeared to conflict with her in-court testimony. An inquiry into Roadcap's actions yielded concerns that she and Balshy may have conspired to alter Roadcap's November 1972 notes so the potentially exculpatory evidence would

be hidden. The new evidence regarding Roadcap's altered notes resulted in Crawford's filing of a petition for post-conviction relief in December 2001.

### G. Investigation by the Dauphin County District Attorney

As a result of the discovery of the copy of Roadcap's original, unobliterated notes, the Dauphin County District Attorney's Office sought further clarification on the nature of the two apparently inconsistent documents. This investigation revealed several new facts that were not revealed during the underlying criminal investigations or trials. Roadcap was deposed in June 2002. She generally reiterated her testimony offered in the three previous criminal trials. While she had no recollection of having any conversation with Balshy regarding her conclusions, she testified she recorded her notes while Balshy was present in the lab room with her. Roadcap testified her job duties as a PSP chemist included not only testing for the presence of blood, but also making a determination as to the medium of transfer, or how the blood got onto the print. Notably, however, Roadcap testified, in her entire 23–year career with the PSP, she only testified as an expert witness in the areas of chemistry and serology; she acknowledged the Crawford case was the only case in which she presented expert testimony concerning "fingerprint analysis or identification or anything else related to fingerprints ... [including,] how the blood [in the Crawford case] got in the various portions of the print...." OGC Op. at 19.

Through her testimony, which was given for the express purpose of explaining the discrepancies between the obliterated and un-obliterated version of the notes, Roadcap again admitted having detected blood in the valleys of the print. She also admitted to having obliterated her notes and stated she did so because her original notes were "incomplete." *Id.* Roadcap further admitted the obliterated notes reflect something "[d]ifferent than what I saw under the microscope, but I had already crossed this off because I had already arrived at the opinion that those small particles came from the ridges." OGC Op. at 20. Nevertheless, Roadcap insisted her notes and testimony were not false representations. According to Roadcap, the findings she recorded in her original notes were incomplete and thus inaccurate, leading her to cross-out the inaccurate portions and replace them with more precise findings.

Based on Roadcap's deposition testimony, the Dauphin County District Attorney's Office, determined Crawford would be entitled to relief in the form of a new trial in connection with his petition for post-conviction relief. Additionally, the District Attorney's Office decided to enter a *nolle prosequi* and discharge Crawford for the stated reasons of stale evidence, deceased witnesses, an unwillingness of the victim's family to engage in a fourth trial and general interests of justice. The Commonwealth did not represent that the withdrawal of the charges was due to Crawford's innocence in the Mitchell murder.

### H. Crawford's Federal Suit

In 2003, Crawford filed a civil suit against Roadcap, Balshy, the Estate of Sgt. Simpson, the Commonwealth, the County of Dauphin and the City of Harrisburg. Through his complaint, Crawford averred Roadcap "altered [her] original lab notes by obliterating the reference to blood being found in the valleys" and that this action was "intentionally carried out to materially alter the record and conceal information which was exculpatory to Mr. Crawford." OGC Op. at 21. Crawford further alleged Roadcap's conduct in fail-

ing to disclose her original notes amounted to a "failure of the Commonwealth to conform to its obligations under the Constitution of the United States and the Constitution and laws of Pennsylvania[,]" an act which "undermined the truth-determining process and jeopardized the integrity of the judicial system." *Id.* The complaint also averred Balshy and Roadcap "provided false testimony as part of a conspiracy to wrongfully convict Mr. Crawford" and ultimately committed fraud, perjury, false imprisonment, conspiracy and intentional infliction of emotional distress. *Id.*

During discovery in the civil suit, Herbert MacDonell, a forensic scientist and fingerprint specialist who testified for the Commonwealth in the second and third Crawford criminal trials, produced an affidavit in which he stated, in part:

> Had I been provided with the information which was contained in the November—29 November 1972 state police report prior to my testimony, I would not have testified as I did. In fact, I most likely would have informed the jury that the palmprint evidence was of no value since it is not possible to establish when it was placed on the vehicle.

OGC Op. at 22.

MacDonell was later deposed. MacDonell initially noted the original lift viewed by Roadcap and Balshy had apparently been lost or destroyed or at least it was not available. Therefore, he was never able to view the original print. However, MacDonell did review photographs of the lift, noting that while he preferred to view the original print, the photographs were very "good." *Id.* In addition, he performed various experiments exploring a

variety of possible methods of transfer of the blood. Notably, MacDonell *conducted* those tests to determine whether his original opinion offered at the criminal stage was still supportable, despite the newly discovered evidence. MacDonell concluded his original opinion was still supportable.

Specifically, after reviewing photographs of the original print, MacDonell testified Roadcap's conclusion, that if there were few enough of the particles in the valleys of the print that they could have simply fallen from the ridges, was supportable. However, MacDonell did not observe what Roadcap and Balshy observed under the microscope. Also, when asked whether he ever obliterated lab notes or observed another scientist engage in that practice, MacDonell replied, "It's not something that I think I've ever seen before in anything like this ... [e]ver, before or since." OGC Op. at 24. MacDonell further testified:

> A. No, I should have inquired further. I would like to know why that happened
>
> . . .
>
> Q. Had it been shown to you?
>
> A. Had it been shown to me, I would like to know what was there originally, you know, I would have liked to have talked to Janice Roadcap and said, what, what's going on, what happened. It was a poor choice for her to do that.... [W]hether or not that would have changed my opinion I really can't say.

Ultimately, Crawford's federal suit proceeded to trial. After three days of trial, the parties entered into a settlement agreement.[2]

---

2. As noted, Crawford's civil suit named the Commonwealth as a defendant. However, the federal district court granted the Commonwealth's motion to dismiss Crawford's claims against it. *See Crawford v. Common-* *wealth,* No. Civ.A. 1:CV–03–693, 2003 WL 22169372 (M.D.Pa. September 12, 2003). Nevertheless, because the case did not proceed to judgment as to all parties, the district court did not render a final, appealable deci-

## I. Administrative Hearing Before Hearing Officer Jackie Lutz, Esq.

At the administrative hearing on Balshy and Roadcap's requests for reimbursement of attorney's fees, Francis Chardo, an assistant district attorney in Dauphin County, was the first to testify about the circumstances surrounding the criminal cases against Crawford, and Balshy and Roadcap's involvement in those cases. Chardo noted the matter was initially brought to his attention by a retired police investigator who considered the discovery of the original report significant. Chardo himself concluded the palm print was "the most significant piece of evidence linking Crawford to the crime." OGC Op. at 25.

The PSP also proffered testimony from Chardo noting that police have a duty to disclose exculpatory evidence to the defense. Chardo testified he considered Roadcap's original notes "exculpatory" and therefore the PSP produced them to the defense. *Id.*

Also testifying before the hearing officer was Christopher Carusone, a former deputy general counsel with the PSP. Carusone testified to the contents of an investigatory interview he conducted with Roadcap concerning her two sets of laboratory notes. Carusone testified Roadcap admitted to him that she and Balshy had a conversation after she showed him her laboratory notes and Balshy "began to theorize about what the defense could do with the fact that there were particles, blood particles, in the valleys" and Balshy informed Roadcap "the defense could cross examine her in an effort to try to show that the print was in fact on the vehicle and that the blood had splattered onto it [before or after Mitchell was murdered]." *Id.* Caru-

sone also testified Roadcap admitted to him she was aware the palm print contained particles in the valleys, but she purposefully obliterated this information in her report and did not testify at the trials concerning particles in the valleys. Carusone further explained:

A. [Roadcap] indicated to me in the presence of Mary Ann Lewis from the AG's office that when she reported her findings to John Balshy that Mr. Balshy began to theorize about what the defense could do with the fact that there were particles, blood particles, being found in the valleys and that he began theorizing with her that the defense could cross examine her in an effort to try to show that the print was in fact on the vehicle[ ] and that the blood had splattered on it. Ms. Roadcap then said to me she did not believe that that's what happened, and I remember she was pretty strong in her opinion that that's not what she believed would have happened, that the particles that she found in the valleys were too small in number and that there was no fingerprint patter[n] associated with that, and so she did not believe that the print was on the car and that the blood spattered on it. Instead, she believe[d] that the flakes of the blood particles had flaked off from the top of the ridges and had flaked into the valleys and that's where she thought the origin of the particles were. She then indicated to me that she did use a magic marker and then had obliterated any reference to finding particles in the valleys. And then she said some things that are actually quite memorable to me. She said she obliterated those references because she believed they came from the ridges, that

---

sion. *See* F.R.A.P. Rule 4(a)(4). In addition, a review of the parties' settlement agreement reveals the Commonwealth was listed as re-

leased from the litigation upon settlement. Reproduced Record at 1405a.

she didn't want to be questioned about the particles that were in the valleys. She didn't want anything to do with those particles. She didn't want that used against her and twisted around by a defense attorney. She was trying to protect herself. She didn't want the defense to know about those particles and that she didn't need that information anymore. And I recall being—to be honest, I recall being shocked that a forensic scientist would say something like that.

Q. Now once she obliterated that did she comment on her testimony?

A. She said that once she obliterated that language she decided she was not going to testify that she saw particles in the valleys. She did indicate that Mr. Balshy knew of her actions but that he did not tell her what to do. And she also indicated that although this was [Sgt.] Simpson's case that Simpson was kind of acting at the direction of Balshy, that Mr. Balshy had taken control.

OGC Op. at 25–26.

Next, Harry Fox, III, the former director of the PSP's scientific services division, testified regarding Roadcap's position and duties with the PSP and indicated Roadcap's duties did not include fingerprint examination.

Both Roadcap and Balshy also testified at the administrative hearing. Roadcap denied making any of the incriminating statements recounted by Attorney Carusone. She testified: "I don't remember any questions like that or any answers that I gave like he stated." OGC OP. at 26. Roadcap admitted conversing with Balshy about how much of the palm print sample she could use for the testing and allowing Balshy to view the benzidine test through a microscope, but she insisted a conspiracy did not occur between herself and Balshy to manipulate potentially exculpatory evi-

dence. Roadcap also testified to the reasonableness of the legal fees she incurred in her defense of Crawford's civil suit.

Through his testimony, Balshy confirmed he went back to the lab room with Roadcap and Simpson and viewed the palm print through the microscope. Balshy maintained that his testimony during all three Crawford criminal trials was truthful. He was not asked during the hearing whether he suggested to Roadcap that she alter lab notes to reflect different findings.

## J. OGC's Analysis

Based on the evidence presented, OGC determined both Roadcap and Balshy engaged in conduct that amounted to a bad faith exercise of their authority, malicious conduct, and conduct outside the scope of their employment. In so doing, OGC pinpointed four specific instances of misconduct by Balshy and Roadcap that supported this determination. In particular, OGC determined: (i) Balshy's actions rose to the level of bad faith because he suggested Roadcap change her test results to reflect no blood in the valleys of the palm print; (ii) Roadcap's actions amounted to bad faith to the extent she allowed Balshy's comments to influence her and to detract from her impartiality and sway her into manipulating her findings to help secure a conviction; (iii) both Balshy and Roadcap acted in bad faith by failing to notify the district attorney and the defense of the original findings regarding the presence of blood in the valleys of the palm print; and, (iv) both Balshy and Roadcap acted in bad faith by providing false or misleading testimony in the three Crawford criminal trials as to the existence of blood particles in the valleys of the palm print.

OGC determined both Roadcap and Balshy committed blatant, intentional miscon-

duct through their deliberate concealment of the original findings regarding detection of blood in the valleys of the palm print. OGC noted the palm print at issue was the most significant piece of evidence linking Crawford to the murder in that it was the sole item of evidence that placed Crawford in the garage at the time of the murder. Absent this evidence, OGC determined, the prosecution would have been forced to rely on nothing more than circumstantial evidence. Given the significance of this evidence and Balshy and Roadcap's bad faith conduct, OGC concluded Balshy and Roadcap were not entitled to reimbursement of legal fees and costs in defending themselves in Crawford's civil suit.

Balshy and Roadcap filed petitions for review with this Court, which were consolidated. This matter is now before us for disposition.

As to our standard of review, this Court shall affirm the adjudication unless it shall find the adjudication is in violation of the constitutional rights of the appellants, or is not in accordance with law, or the statutory provisions controlling practice and procedure of Commonwealth agencies have been violated in the proceedings before the agency, or any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. 2 Pa.C.S. § 704; *Irizarry v. Office of Gen. Counsel*, 934 A.2d 143 (Pa. Cmwlth.2007).

## III. Discussion

### A. Jurisdiction

At the outset, we recognize a possible jurisdictional issue which was first raised by this Court. In our order of October 27, 2009, we directed the parties to file supplemental briefs addressing whether "42 Pa. C.S. § 8525 vests original jurisdiction in a 'court' to determine whether the act of a state employee seeking indemnification and/or costs of legal defense is within the 'scope of his office or duties of the employee?' " Order of 10/27/09.

Section 8525 of the statute commonly known as the Sovereign Immunity Act states, in its entirety:

**§ 8525. Legal Assistance.**

When an action is brought under this subchapter against an employee of the Commonwealth government, and it is alleged that the act of the employee which gave rise to the claim was within the scope of the office or duties of the employee, the Commonwealth through the Attorney General shall defend the action, unless the Attorney General determines that the act did not occur within the scope of the office or duties of the employee. In the latter case, if it is subsequently determined that the act occurred within the scope of the office or duties of the employee, the Commonwealth shall reimburse the employee for the expense of his legal defense in such amounts as shall be determined to be reasonable by the court. If an action is brought against a Commonwealth government employee for damages on account of injury to a person or property and it is not alleged that the act of the employee which gave rise to the claim was within the scope of his office or duties, and he successfully defends the action on the basis that the act was within the scope of his office or duties, and he has given prior notice to the Attorney General and the Attorney General has refused to defend the action, he shall likewise be entitled to the reasonable expenses of the defense.

42 Pa.C.S. § 8525.

#### 1. Contentions

As to the application of Section 8525, Balshy and Roadcap argue as follows.

Section 8525 is two-pronged. First, it provides for an initial determination as to "scope of employment" by the Attorney General. Second, it provides for reimbursement "if it is subsequently determined that [an] act occurred within the scope of the office or duties of the employee." *Id.* As to the first prong, the statutory language is clear and unambiguous: the determination rests with the Attorney General. As to the second prong, it is silent. Nowhere in Section 8525 does it explicitly grant jurisdiction over the subsequent determination in requests for reimbursement, and it neither explicitly nor implicitly vests original jurisdiction in any "court." Further, there is no case law to support the position that original jurisdiction lies in any "court." Thus, we must rely upon and follow the regulations promulgated by the Executive Board at 4 Pa.Code, Chapter 39 to answer the jurisdictional question posed by the Court.

To that end, the standards under which the Commonwealth will provide representation, indemnification and reimbursement to a Commonwealth employee who is sued civilly in his or her official or individual capacity are set forth in the regulations found at 4 Pa.Code §§ 39.2 and 39.3, which have the full effect and force of law. *See Flagg v. State Sys. of Higher Educ.*, 904 A.2d 1004 (Pa.Cmwlth.2006) (4 Pa.Code § 39.3(b) controlled OGC's determination of request for representation by Commonwealth employee). Thus, the proper procedure for determining whether the act of an employee seeking reimbursement for legal defense fees is the procedure set forth in 4 Pa.Code, Chapter 39, which Balshy and Roadcap followed here.

Further, where first the Attorney General and, subsequently, OGC have determined the acts of an employee seeking reimbursement were malicious, in bad faith or outside the scope of employment,

it is within the appellate jurisdiction of this Court to review the OGC's opinion.

For its part, OGC argues as follows. Balshy and Roadcap seek reimbursement of counsel fees and costs arising out of a civil action advanced by Crawford involving the following claims: 4th and 14th Amendment under 42 U.S.C. §§ 1983, 1986, fraud, false imprisonment, conspiracy and intentional infliction of emotional distress. Crawford's civil suit alleged Balshy and Roadcap knowingly, deceitfully, falsely, fraudulently, with reckless disregard and racial motivation "doctored" laboratory findings and concealed exculpatory evidence during the course of the criminal investigation of Crawford for murder. Crawford alleged he was wrongfully imprisoned for 28 years because of Roadcap and Balshy's actions, and he was released upon discovery of exculpatory evidence that neither Balshy nor Roadcap disclosed to the court or to defense counsel during any of his three criminal trials.

The Commonwealth has no common law duty to indemnify or provide legal representation to Commonwealth employees who are defendants to either civil or criminal actions. Absent extension of indemnification "rights" through statutory means, or "benefits" through voluntary regulatory or contractual authority, employees would be required to satisfy any judgment rendered against them and to pay for their own legal defense.

Recognizing suits against "innocent" government employees arising out of the performance of their duties are not uncommon, and understanding the financial burden such litigation presents, the General Assembly and the Executive Board determined Commonwealth employees, with certain exceptions, should be entitled to indemnification and legal representation. Further recognizing taxpayers should not bear the burden of all conduct that occurs

while Commonwealth employees are on the clock, the General Assembly and Executive Board effectively created a graduated scale of conditional benefits, with the scope of available benefits varying depending on the nature of the conduct at issue.

While not intended as an exhaustive list of all potential vehicles through which employee indemnification rights may be established, OGC notes two separate legal bases for provision of these rights: (1) through 4 Pa.Code, Chapter 39 (Entitlements for Commonwealth Employees), the Executive Board extended conditional benefits to Commonwealth employees in three separate categories of cases: (a) criminal actions; (b) civil actions involving unintentional conduct; and, (c) civil actions involving intentional or malicious conduct; and (2) through legislation cited by the Court in its October 27, 2009 order, Section 8525 of the Judicial Code, so long as an employee is acting within the scope of his employment, the General Assembly requires provision of legal counsel and indemnification in "negligence" cases arising under one of nine narrowly defined exceptions to the Sovereign Immunity Act. *See* 42 Pa.C.S. §§ 8501–8528.

## 2. Analysis

■ Upon review of the parties' contentions, we conclude Section 8525 of the Sovereign Immunity Act is inapplicable to Balshy and Roadcap's requests for reimbursement and indemnification here.

As noted above, Section 8525, which contemplates legal assistance for Commonwealth employees in certain limited circumstances, begins with the following language:

> When an action is brought *under this subchapter* against an employee of the Commonwealth government, and it is alleged that the act of the employee which gave rise to the claim was within the scope of the office or duties of the employee, the Commonwealth through the Attorney General shall defend the action, unless the Attorney General determines that the act did not occur within the scope of the office or duties of the employee. . . .

42 Pa.C.S. § 8525 (emphasis added).

Thus, representation by the Attorney General is conditioned on the underlying action—here Crawford's civil suit—being brought under Chapter 85, Subchapter B of the Judicial Code, which is entitled "Actions Against Commonwealth Parties," and captioned "Sovereign Immunity." 42 Pa. C.S. §§ 8521–8528. Pursuant to that statute, the Commonwealth and its agencies are immune from suit except where the General Assembly specifically waives immunity. 1 Pa.C.S. § 2310; 42 Pa.C.S. § 8521. A Commonwealth party[3] is not liable unless (1) the alleged act of the commonwealth party is a negligent act for which damages would be recoverable under the common law or by statute, 42 Pa.C.S. § 8522(a); and (2) the act of the Commonwealth party falls within one of the exceptions listed in 42 Pa.C.S. § 8522(b).[4] *Kuniskas v. Commonwealth,* 977 A.2d 602 (Pa.Cmwlth.2009).

---

3. The Sovereign Immunity Act defines a "Commonwealth party" as a "Commonwealth agency *and any employee thereof,* but only with respect to an act within the scope of his office or employment." 42 Pa.C.S. § 8501 (emphasis added).

4. The nine exceptions to sovereign immunity are as follows: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody and control of animals; (7) liquor store sales; (8) National Guard activities; and, (9) toxoids and vaccines. 42 Pa. C.S. § 8522(b)(1)-(9).

Here, Crawford's civil suit alleged violations of the federal Civil Rights Act, 42 U.S.C. §§ 1983, 1985, 1986, as well as state law and tort claims. Significant for our analysis, none of Crawford's claims sounded in negligence. Moreover, none of Crawford's claims fell within any of the nine exceptions set forth in Section 8522(b) of the Sovereign Immunity Act. Therefore, Section 8525 of the Sovereign Immunity Act is inapplicable here. To hold otherwise would be to ignore the plain and unambiguous meaning of Section 8525 of the Sovereign Immunity Act.[5]

Instead, in actions involving alleged violations of federal civil rights and other intentional misconduct, a Commonwealth employee's entitlement to reimbursement for legal fees is derived from Section 709(f) of the Administrative Code of 1929,[6] which states, in pertinent part:

> Subject to the provisions of this act, the Executive Board shall have the power:
>
> \*      \*      \*
>
> (f) To make rules and regulations providing for ... expenses for which all officers and employes of the executive branch of the State Government may be reimbursed....

71 P.S. § 249(f).

Pursuant to this legislative grant of authority, the Executive Board promulgated regulations codified at 4 Pa.Code, Chapter 39,[7] which "authorize[ ] designated mem-

---

5. This interpretation is bolstered by a review of the May 1978 report on "Sovereign Immunity" authored by the General Assembly of the Commonwealth of Pennsylvania, Joint State Government Commission. GENERAL ASSEMBLY OF THE COMMONWEALTH OF PENNSYLVANIA, JOINT STATE GOVERNMENT COMMISSION, HARRISBURG, PENNSYLVANIA, MAY 1978 *available at http://jsg.legis.state.pa.us/sovereignimmunity.pdf*. In that report, the Joint State Government Commission stated:

> In developing the eight previously discussed areas of liability in which waiver of sovereign immunity is proposed, the task force considered other areas of potential waiver and determined to retain sovereign immunity. In evaluating the areas rejected, the task force reviewed among other materials the *statutory exceptions provided in* other jurisdictions.
> *The task force specifically rejected waiving sovereign immunity for claims arising out of:*
>> (1) *Intentional torts* such as assault and battery, false imprisonment, false arrest, malicious prosecution, abuse of privacy, libel and slander, misrepresentation, deceit, interference with contract rights, fraud and invasion of privacy.
>> \* \* \* \*
>> (5) *Civil rights and constitutional violations* ....

*Id.* at 15–16 (emphasis added).

6. Act of April 9, 1929, P.L. 177, *as amended.*

7. By way of background on this set of regulations, as noted in OGC's supplemental brief, Title 4, Chapter 39 of the Pennsylvania Code was originally promulgated in 1976:

> As originally promulgated in 1976, these regulations provided that the Attorney General should determine in which cases members, officials and employes of the Commonwealth's executive branch should be afforded the benefits of legal representation or reimbursement for attorneys' fees incurred in defending against criminal actions and civil actions, or both, asserted against officials and employes in their personal capacities. The Attorney General also was designated as the person to determine whether members, officials and employes of the executive branch, required personally to pay civil damages for conduct arising out of the performance of their public duties, should be afforded the benefit of indemnification by the Commonwealth.

24 Pa. Bull. 5655 (November 12, 1994). The Executive Board amended Title 4, Chapter 39, in November 1994, stating:

> *Whereas,* the Executive Board on February 28, 1976, adopted the regulation at 4 Pa.Code Sec. 39.1, et seq., requiring approval of the Attorney General of requests for reimbursement of attorney fees and requests for approval for representation for Commonwealth officers and employes; and
> *Whereas,* pursuant to Act 1980–164, 71 P.S. Sec. 732–101, et seq., the Office of

bers of the executive branch to determine whether to reimburse legal fees to employees of the executive branch...." *Yurgosky v. Admin. Office of Pa. Courts,* 554 Pa. 533, 542, 722 A.2d 631, 635 (1998); *see also Dep't of Corr. & Dep't of Pub. Welfare v. Pa. State Corr. Officers Ass'n,* 932 A.2d 359 (Pa.Cmwlth.2007), *appeal granted in part,* 601 Pa. 102, 971 A.2d 1124 (2009); *Burroughs v. Zimmerman,* 94 Pa.Cmwlth. 307, 503 A.2d 1014 (1986); *In re Plevyak,* 83 Pa.Cmwlth. 81, 476 A.2d 487 (1984).

The authority of OGC to determine whether a Commonwealth employee who is subject to a civil suit will be afforded legal representation or reimbursed for attorney's fees is governed by 4 Pa.Code § 39.13, which states:

(b) Determination by the OGC.

(1) Question of representation by Commonwealth attorney. In cases reported to OGC ... the liaison or designated deputy general counsel will determine, in accordance with §§ 39.2—39.4 (relating to civil cases involving unintentional conduct; civil cases involving intentional or malicious conduct; and employe responsibility), whether the Commonwealth may provide an attorney to defend the member, official or employe....

Further, Sections 39.1 through 39.3 of the regulations, 4 Pa.Code §§ 39.1–39.3, set forth the circumstances in which the Commonwealth will provide defense counsel in suits brought against Commonwealth employees. In particular, Section 39.2 concerns civil suits involving unintentional conduct, while Section 39.3 addresses civil suits involving intentional or malicious conduct. Section 39.3, which distinguishes between "good faith" and "bad faith" conduct by a state employee who is sued civilly states (emphasis added):

(a) Good faith in exercise of authority. Regardless of the allegations made against the defendant, if it appears to the General Counsel or to the General Counsel's designee that the defendant's conduct giving rise to the cause of action was within the scope of his employment and a good faith exercise of his authority, the Commonwealth ... will undertake the defense with an attorney of its choosing at its expense, and will indemnify the defendant for the expense of a judgment against him or a settlement that is approved by the General Counsel or the General Counsel's designee. The defendant may engage his own attorney but indemnification and reimbursement of attorneys fees by the Commonwealth

General Counsel succeeded to the powers and duties of the former Department of Justice and appointed the Attorney General to decide upon requests of executive branch officers and employes for reimbursement for attorney fees ..., be it

*Resolved,* that the Executive Board by this action authorizes the Office of General Counsel to decide upon requests for reimbursement for attorney fees for officers and employes of the Executive Branch and to exercise the powers and duties conferred up on the former Department of Justice and appointed Attorney General under 4 Pa. Code Sec. 39.1 et seq.

The Office of Attorney General has recognized Resolution # ER–85–275 as an effective transfer of responsibility from the Attorney General to the Office of General Counsel. *See John Burroughs, et al. v. Leroy S. Zimmerman, Attorney General of Pennsylvania, et al.,* No. 1004 C.D. 1985 (order issued March 25, 1986 by Allen C. Warshaw, Executive Deputy Attorney General and Director of Commonwealth Agencies Legal Services Division, transferring matter governed by 4 Pa.Code Secs. 39.1—39.4 from the Office of Attorney General to the Office of General Counsel under Resolution # ER–85–275), following transfer by order entered in *Burroughs v. Zimmerman,* 94 Pa. Cmwlth. 307, 503 A.2d 1014 (1986).

24 Pa. Bull. 5655.

will be in the sole discretion of the General Counsel.

(b) *Bad faith or malicious conduct, or conduct outside the scope of employment.*

(1) If the General Counsel or the General Counsel's designee determines that *the defendant's conduct was a bad faith exercise of his authority, malicious or outside the scope of his employment, the General Counsel, in his sole discretion, will determine whether the Commonwealth will undertake the defense of the defendant.* The Commonwealth will not indemnify the defendant for a judgment against him, and will notify the defendant that he may be subject to personal liability and should engage his own attorney.

(2) If the General Counsel or the General Counsel's designee has determined initially that the defendant's conduct was a bad faith exercise of his authority, malicious or outside the scope of his employment, and the defendant ultimately prevails in the civil action, the General Counsel, in his sole discretion, may determine that the Commonwealth will reimburse the defendant for the costs of defense and fees of his private attorney. . . .

"If OGC disapproves a request for legal representation . . . the member, official or employe[e] may file a petition of appeal to the General Counsel . . . within 10 days after service of the notice of the decision of OGC." 4 Pa.Code § 39.13(d)(1).

Where an employee files a timely appeal petition, OGC designates a deputy general counsel to serve as presiding officer and to act as advisor to the General Counsel or a designee in preparing and issuing an adjudication. The presiding officer does not prepare a proposed report, but rather certifies the record to the General Counsel or a designee for adjudication. 4 Pa.Code § 39.13(d)(5)(i).

Here, Balshy and Roadcap filed petitions for appeal from the decision of OGC's Deputy General Counsel, who determined they were not entitled to reimbursement for legal fees in the underlying federal suit because they engaged in conduct that constituted a bad faith exercise of their authority, was outside the scope of their employment or was malicious. After hearing before a designated hearing officer, OGC issued an opinion in which it agreed with Deputy General Counsel's determinations that the conduct of Balshy and Roadcap was malicious, in bad faith or outside the scope of their employment.

Based on the relevant provisions of the Administrative Code of 1929 and the regulations promulgated pursuant to that statute, we believe Balshy and Roadcap followed the correct procedures in seeking indemnification and reimbursement of legal fees here. *See, e.g., Irizarry* (4 Pa. Code § 39.3(b)(2) controlled General Counsel's determination of indemnity claim by Commonwealth employee); *Flagg* (4 Pa. Code § 39.3(b) controlled General Counsel's determination of request for representation by Commonwealth employee).

Moreover, our Supreme Court's decision in *Wiehagen v. Borough of North Braddock,* 527 Pa. 517, 594 A.2d 303 (1991), does not compel a different result. There, our Supreme Court considered whether a municipality was required to indemnify its police officer under the statute commonly known as the Political Subdivision Tort Claims Act (Tort Claims Act), 42 Pa.C.S. §§ 8541–64, for compensatory damages assessed against the officer in a 42 U.S.C. § 1983 action; and, if so, whether such indemnification included attorney fees, costs and expenses incurred by the plaintiff in the § 1983 action. Factually, *Wiehagen* involved a suit against a police officer

and a municipality based on the officer's act of striking the plaintiff after his arrest for public intoxication. A federal jury awarded compensatory damages against the police officer, and the federal court ordered the police officer to reimburse the plaintiff for his attorney's fees, costs and expenses. The police officer sought indemnification from the municipality for these amounts pursuant to Section 8548(a) of the Torts Claims Act, 42 Pa.C.S. § 8548 (relating to "indemnity" by local agency and employee of local agency). Notably, the municipality stipulated the police officer was acting within the scope of his duties when he struck the plaintiff.

Our Supreme Court held the municipality had to fully indemnify the officer. The Court found no language in Section 8548 of the Tort Claims Act that limited indemnification to conduct involving the eight exceptions in Section 8542(b) of the Tort Claims Act. The Court explained:

Section 8548 [of the Tort Claims Act] clearly and unambiguously provides that "the local agency shall indemnify the employee for the payment of *any judgment* " in an action for injury to person or property brought against an employee where the employee was acting within the scope of his duties. (Emphasis added). Clearly, this section was intended to provide for indemnification for *any* judgment that may be rendered against an employee while acting within the scope of his employment. There is no reasonable basis to conclude that the Legislature intended to provide for indemnification on the state level but not on the federal level. This interpretation is in accordance with the purpose of the statute, which is to permit local agency employees to perform their official duties without fear of personal liability, whether pursuant to state or federal law, so long as the conduct is performed during the course of their employment.

Accordingly, because there is a judgment against [the police officer] arising from conduct within the scope of his employment, the [b]orough is liable to indemnify [the police officer]....

*Id.* at 522, 594 A.2d at 305–306. Further, as to the officer's entitlement to indemnification for attorney's fees, costs and expenses incurred by the plaintiff in the underlying § 1983 action, the Court stated:

We first note that Section 8548 does not limit the amount of indemnification in any manner, but rather provides that the "local agency shall indemnify the employee for the payment of *any judgment* on the suit." (Emphasis added). In fact, through Section 8548(b) the Legislature has actually gone as far as to provide that the employee shall not even be liable for any expenses or legal fees incurred by the local agency during the employee's defense....

In addition, [Section 8547 of the Tort Claims Act] provides further evidence of the Legislature's intent that [the officer] and others similarly situated suffer no financial loss while defending acts performed within the scope of their employment. Section 8547 actually obligates local agencies in these circumstances to defend the action on behalf of the employee or reimburse the employee for reasonable expenses incurred in defending the action, and as noted above, the employee is not liable for any expenses or attorney fees thereby incurred by the local agency pursuant to Section 8548(b). We are equally convinced that the legal assistance provided for in Section 8547 extends to federal actions in the same manner as the indemnification provided by Section 8548.

Accordingly, since Section 8548 provides that [the officer] is entitled to indemnification for *any judgment*; since Section 8548 does not limit the indemni-

fication to which [the officer] is entitled ... and since the Legislature has also provided that [the officer] is even entitled to legal assistance from the [b]orough, such indemnification by the [b]orough in the case *sub judice* must include reasonable attorney fees, costs, and expenses, which were incurred by [the plaintiff] in advancing his Section 1983 claim, and reduced to judgment against [the officer]. Therefore, the [b]orough must indemnify [the officer] for the total judgment. . . .

*Id.* at 523–524, 594 A.2d at 306–307 (emphasis in original) (footnote omitted). *See also Renk v. City of Pittsburgh*, 537 Pa. 68, 641 A.2d 289 (1994) (municipality required to indemnify police officer for damages following verdict against officer for assault, battery, false imprisonment, and emotional distress where municipality did not prove officer's actions amounted to "willful misconduct" under Section 8550 of the Tort Claims Act, 42 Pa.C.S. § 8550).

*Wiehagen* is not controlling here. That case involved an indemnity action under the Tort Claims Act, while this case concerns a request for reimbursement of attorney's fees and indemnification under the Executive Board regulations promulgated to the Administrative Code of 1929.

Moreover, even if the Sovereign Immunity Act applied here, *Wiehagen* would not control. This is because of the significant differences between the "legal assistance" and "indemnity" provisions of the Tort Claims Act, and the "legal assistance" provision of the Sovereign Immunity Act. *Compare* 42 Pa.C.S. §§ 8547, 8548(a), (b) (requiring defense and indemnity of local agency employees absent a "judicial determination"[8] that the employee's actions were outside the scope of his employment)

*with* 42 Pa.C.S. § 8525 (requiring the Attorney General to defend an action against a Commonwealth employee unless *the Attorney General determines* the employee's act did not occur in the course and scope of the employee's duties). Because the express language of the Tort Claims Act and the Sovereign Immunity Act differs materially with regard to the "legal assistance" and "indemnity" provisions, the plain language of the Sovereign Immunity Act would not justify a result consistent with the Tort Claims Act in this situation.

In sum, we reach the following conclusions: Section 8525 of the Sovereign Immunity Act is inapplicable here because that provision only applies where negligent actions of the Commonwealth employee fall within one of the nine exceptions in which sovereign immunity is waived; Balshy and Roadcap followed the correct procedure here in order to seek reimbursement of attorney's fees and costs by pursuing their claims before OGC as required by the Administrative Code of 1929 and the regulations promulgated pursuant to that statute; and, case law interpreting the "indemnity" and "legal assistance" provisions in the Tort Claims Act is inapposite here. For these reasons, Balshy and Roadcap properly pursued their claims for reimbursement before the OGC, which possessed jurisdiction over these claims, and the OGC's denial of those claims is properly before this Court in our appellate jurisdiction. Therefore, we now address the merits of the parties' contentions.

### B. Merits

#### 1. Contentions

As to the merits, Balshy argues the record lacks substantial evidence to sup-

---

8. Notably, "judicial determination" is a specifically defined term for purposes of the immunity statutes. *See* 42 Pa.C.S. § 8501 (defining "Judicial determination" as "[a]ny determination *by a court of competent jurisdiction* including any settlement approved by such court.") (Emphasis added).

port OGC's determination that he acted maliciously, outside the scope of his employment or in bad faith in connection with the investigation and prosecution of Crawford, either generally or in regard to the specific wrongful acts OGC determined he committed. Balshy asserts his role in the investigation and the murder trials was limited. He further contends all of the experts who ever testified in this case concluded Crawford's palm print was a "positive print," making the existence of blood particles in the "valleys," a red herring. Balshy argues OGC's opinion selectively takes isolated acts and attempts to cobble them together to show he committed misconduct, while capriciously disregarding other relevant evidence.

More particularly, Balshy challenges OGC's finding that he viewed the palm print under the same magnification as Roadcap and, therefore, actually observed blood particles in the valleys. He also attacks two of OGC's "subjective determinations" regarding his state of mind. To that end, Balshy asserts the record does not support OGC's determinations that he exerted influence over Roadcap so she would arrive at the conclusion he wanted (i.e., one that supported the prosecution), and that he intended to direct Roadcap to alter her notes. Balshy asserts the record lacks evidence that would suggest any sort of motive for OGC's conclusion that he somehow conspired with Roadcap to frame Crawford.

In short, Balshy maintains he acted within the scope of his employment by taking the print evidence to the lab and requesting a blood analysis report. He denies any wrongdoing, asserting he never suggested to Roadcap that she ought to alter her notes to reflect no findings of blood in the valleys of the palm print.

Like Balshy, Roadcap argues the record lacks substantial evidence to support OGC's decision that her request for indemnification should be denied. She asserts this Court should overturn that decision and find that in conducting her analysis of the palm print, amending her own notes and having a laboratory report based on those amended notes, she acted without malice, there was no bad faith and she was well within her scope of employment as a PSP chemist. Based on that finding, Roadcap maintains, the Commonwealth should be instructed to make payment to her attorneys in the amount of $187,647.18, for fees and costs incurred in her defense, as well as all additional fees and costs related to representation for the administrative hearing and this appeal.

Roadcap contends the record lacks substantial evidence that her conduct at any time relevant here was malicious or in bad faith or that she conspired with Balshy to withhold or alter evidence in the Crawford case. She asserts she had no knowledge at the time she conducted the palm print tests about who the victim was, who the defendant was, whose palm print she was analyzing or anything else about the case. Roadcap argues her testimony at each of the three Crawford criminal trials, during her deposition, at the civil trial and at the administrative hearing was consistent and truthful. She maintains she testified, as reflected in her amended notes, there were no blood particles in the valleys of the palm print and the tiny particles originally observed had fallen off the ridges, landing in the valleys, and were irrelevant.

Roadcap contends expert forensic analysis by Herbert MacDonell, and others, supports that conclusion. She highlights testimony by Assistant District Attorney Francis Chardo. He testified that during a visit MacDonell concluded, after seeing both the obliterated and un-obliterated reports of Roadcap, that "the blood in the valley, the particles that were present, was

insignificant, that it wouldn't have made a difference in his opinion." R.R. at 648a.

Roadcap asserts a determination of whether conduct of an employee is within the scope of employment should consider whether the conduct: is of a kind and nature the employee is employed to perform; occurs substantially within the authorized time and space limits; and, is actuated, at least in part, by a purpose to serve the employer. Roadcap contends her actions satisfy all of these criteria; thus, she acted within the scope of her employment. She maintains it is also critically important to recognize there was no PSP policy or procedure in effect at the time of the analysis that would have prevented her from amending her notes, whether by crossing them out or obliterating them completely. Roadcap asserts she merely updated her original notes by crossing out imprecise portions and replacing them with more accurate findings; in so doing, she did not alter her notes for an improper purpose. Further, Roadcap argues, the testing she completed, the notes she wrote and her final lab report were proper and well within the scope of her employment as a PSP chemist. Roadcap contends she did not intentionally conceal or alter any evidence in any of the Crawford cases, either alone or in conspiracy with Balshy or Simpson.

Because she acted within the scope of her employment, and there was no malice or bad faith on her part, Roadcap argues, she is entitled to reimbursement of attorney's fees and costs incurred in her defense and for indemnification of her contribution to the ultimate settlement in the Crawford civil suit. Roadcap asserts this Court should further find the fees charged by her attorneys, as supported by the record, are reasonable, appropriate and necessary and should be paid by the Commonwealth.[9]

OGC and the PSP respond the dispositive issue before this Court is whether OGC's opinion is supported by substantial evidence. In considering OGC's opinion,

---

9. Of further note, in the "Statement of Questions Involved" section of her brief, Roadcap also asks whether she should be indemnified for her contribution to the settlement of Crawford's federal civil suit because her full release, in which she admitted no liability or wrongdoing, makes her a prevailing party entitled to indemnification. Notably, however, although Roadcap lists this issue as a question involved in this matter, she does not brief this issue.

OGC and the PSP maintain that Roadcap's "prevailing party" position is unsupported by law. Also, because Roadcap's brief contains no argument in support, the position is waived.

In her reply brief, Roadcap takes issue with OGC and PSP's claim that she waived her "prevailing party" position. Specifically, she contends she did not waive any indemnification or prevailing party argument; however, OGC and the PSP waived their right to raise that issue on appeal. Roadcap argues the "prevailing party" position was not submitted to OGC or its hearing officer below, because the PSP specifically agreed, during a pre-hearing conference call between the hearing officer and all parties, that it would not contest either Balshy or Roadcap's status as a prevailing party for purposes of indemnification based on the global settlement in the federal civil suit. Based on its own verbal stipulation that it would not contest prevailing party status or indemnification at the administrative level, Roadcap contends, the status cannot now be challenged by the Commonwealth.

Because Roadcap did not develop the issue of whether she should be indemnified for her contribution to the settlement of Crawford's federal suit because her full release, in which she admitted no liability or wrongdoing, makes her a prevailing party entitled to indemnification in her brief, we will not address this issue. *See Wicker v. Civil Serv. Comm'n*, 74 Pa.Cmwlth. 548, 460 A.2d 407 (1983) (when issues are not properly raised and developed in briefs and the briefs are wholly inadequate to present specific issues for review, a court will not consider the merits).

they argue, substantial deference must be afforded OGC. They contend this Court cannot substitute its judgment for that of OGC on matters of credibility and factual determinations because an administrative agency is deemed the ultimate fact-finder and may in its discretion accept or reject the testimony of any witness, in whole or in part.

OGC and the PSP assert, while proffering creative alternative theories, Roadcap and Balshy fail to refute the substantial factual basis upon which OGC's opinion is based. In addition, they maintain, neither Balshy nor Roadcap identifies evidence that rises to the level of "overwhelming evidence" justifying a reversal here. At most, OGC and the PSP contend, Roadcap and Balshy reference isolated text or redundant testimony that is otherwise addressed in OGC's opinion. They argue OGC was not required to separately catalog each and every item of evidence.

OGC and the PSP contend the question here is not whether this Court, Roadcap or Balshy would have decided the matter differently; it is whether substantial evidence supports OGC's determination that Roadcap and Balshy engaged in conduct that was malicious, in bad faith and/or outside the scope of their employment when they deliberately misrepresented and concealed potentially exculpatory evidence in a murder investigation. They assert that to accept the arguments of Roadcap and Balshy is to ask this Court to: substitute its judgment for that of OGC; engage in credibility assessments; favor select items of evidence; and, ignore virtually all evidence OGC deemed credible.

## 2. Analysis

■ "It is not within the province of this Court to retry the case or to make independent factual findings and conclusions of law." *Dep't of Transp. v. Herbert*

*R. Imbt, Inc.*, 157 Pa.Cmwlth. 573, 630 A.2d 550, 551 n. 1 (1993). To the contrary, the agency is entrusted with the duty of fact-finding, and we may neither assist nor interfere with this function. *Aloe Coal Co. v. Dep't of Transp.*, 164 Pa.Cmwlth. 453, 643 A.2d 757 (1994). The agency's role as fact-finder includes determining the credibility of witnesses and resolving conflicting evidence. *Id.* An agency's findings need not be supported by uncontradicted evidence, so long as they are supported by substantial evidence. *Gen. State Auth. v. Loffredo*, 16 Pa.Cmwlth. 237, 328 A.2d 886 (1974). If the agency's findings are supported by substantial evidence, they are binding on this Court. *Id.* Additionally, we view the evidence and all reasonable inferences arising from the evidence in the light most favorable to the prevailing party. *Bosnjak v. State Civil Serv. Comm'n*, 781 A.2d 1280 (Pa.Cmwlth.2001).

■ An agency is not required to address each and every allegation of a party in its findings, nor is it required to explain why certain testimony has been rejected. *Krebs Chrysler–Plymouth, Inc. v. State Bd. of Vehicle Mfrs., Dealers & Salespersons*, 655 A.2d 190 (Pa.Cmwlth.1995). The findings need only be sufficient to enable the Court to determine the questions and ensure the conclusions follow from the facts. *Id.*

As to the capricious disregard component of our review, in *Grenell v. State Civil Service Commission*, 923 A.2d 533, 538–39 (Pa.Cmwlth.2007), we stated:

[T]his Court may conclude that an adjudicator has capriciously disregarded competent evidence when the unsuccessful party below has presented "overwhelming evidence" upon which the adjudicator could have reached a contrary conclusion, and the adjudicator has not satisfactorily addressed that evidence by resolving conflicts in the evidence or

making credibility determinations that are essential with regard to the evidence. [*Frog, Switch & Mfg. Co. v. Pa. Human Rels. Comm'n,* 885 A.2d 655, 667 (Pa.Cmwlth.2005) (citing *Leon E. Wintermyer, Inc. v. Workers' Comp. Appeal Bd.* (*Marlowe*), 571 Pa. 189, 812 A.2d 478 (2002)).]

In other words, where there is strong "critical" evidence that contradicts evidence supporting a contrary determination, the adjudicator must provide an explanation as to how it made its determination. The ultimate question is whether an adjudicator "has failed to give a proper explanation of overwhelming critical evidence." *Id.* ...

■ Further, the express consideration and rejection of evidence does not constitute capricious disregard of evidence. *See In re Nevling,* 907 A.2d 672 (Pa.Cmwlth. 2006).

With regard to whether Balshy and Roadcap's conduct was "malicious," in "bad faith," or "outside the scope of employment," we note that our Supreme Court interprets "malice" as:

"Malice" is a word that has acquired a peculiar legal meaning. Black's Law Dictionary defines it as the "intentional doing of a wrongful act without just cause or excuse, with an intent to inflict an injury or under circumstances that the law will imply an evil intent." BLACK'S LAW DICTIONARY 862 (5th ed. 1979). This Court has supplemented this definition often and said that "malice" does not necessarily mean a particular ill-will toward another; it comprehends in certain cases recklessness of consequences and a mind regardless of social duty.

*Cooper v. Delaware Valley Med. Ctr.,* 539 Pa. 620, 634, 654 A.2d 547, 554 (1995).

Further, "bad faith describes conduct of a dishonest nature," *see Erie Municipal*

*Airport Authority v. Agostini,* 152 Pa. Cmwlth. 494, 620 A.2d 55, 57 (1993), or "instances of fraud or corruption." *Thunberg v. Strause,* 545 Pa. 607, 682 A.2d 295 (1996).

Additionally, as set forth in the parties' briefs, "scope of employment" is defined as "[t]he range of reasonable and foreseeable activities that an employee engages in while carrying out the employer's business." BLACK'S LAW DICTIONARY 1374 (8th ed. 2004).

At the outset of the administrative hearing here, the hearing officer stated the burden was on the PSP to prove, during the course of their involvement with the Crawford criminal investigation and prosecution, Roadcap and Balshy acted maliciously, in bad faith or outside the scope of their employment.

■ As detailed below, OGC made extensive findings and determinations, replete with record citations, in support of its conclusion that the conduct of Balshy and Roadcap was malicious, in bad faith or outside the scope of their employment.

As a preliminary matter, OGC determined the blood-palm print evidence was a significant body of evidence for purposes of all three Crawford criminal trials. OGC noted this body of evidence included the palm print itself, all notes taken during the course of analysis of the print, including Roadcap's original, un-obliterated notes and photographs and reports created during the investigation. OGC credited Assistant District Attorney Chardo's conclusion that the palm print was the "most significant piece of evidence linking Crawford" to the Mitchell murder. OGC Op. at 29. OGC stated: "Having no direct evidence of Crawford's presence in the garage at the time of the murder, without the bloody-palmprint evidence, the prosecution would have been forced to rely on nothing more

than circumstantial evidence." *Id.* OGC also stated the testimony of Balshy and Roadcap at the three Crawford criminal trials as it pertained to the medium of transfer of the palm print evidence was critical.

OGC determined all observations made during the course of the forensic testing performed by either Balshy or Roadcap, in particular, those made during the initial palm print benzidine analysis in 1972, constituted relevant evidence, exculpatory and otherwise. Specifically, OGC considered the following conclusions to be relevant, exculpatory evidence:

6. [Positive] reaction was obtained from the reaction of reagents and the fingerprint powder.

7. This reaction was greater along the ridges of the fingerprint, *however, numerous particles in the valleys also gave positive reactions.*

OGC Op. at 30 (emphasis added).

OGC noted Balshy initially submitted the palm print evidence to Roadcap with vague instructions for Roadcap to perform "analysis" of this evidence. However, OGC stated, based on the nature of Roadcap's duties as described in her testimony and the testimony of Harry Fox, Roadcap's role traditionally would have been limited to performing forensic chemical analysis of the print to determine the presence of human blood.

OGC rejected as not credible Roadcap's conclusion that she was required to render an opinion as to the medium of transfer of the palm print. OGC noted Roadcap never performed such an analysis "before or since" the Crawford case, and Fox testified such analysis was beyond the realm of Roadcap's job description and area of expertise. OGC Op. at 30. OGC further stated:

It is also suspect that Roadcap coincidentally engaged in this analysis and arrived at precisely the conclusion Balshy wanted her to, i.e. one that supported the prosecution, despite Roadcap's claim that no one, in particular, Detective Balshy, asked her to, and in light of the fact that this conclusion "coincidentally" served as the sole, critical piece of evidence placing Crawford at the scene of the crime at the time of the murder. Her testimony is questionable in light of the fact that Detectives Balshy and Simpson were present in the lab with Roadcap during the entirety of the initial benzidine test, and Roadcap claims to have refrained from any conversation with Balshy and Simpson whatsoever, other than basic conversation pertaining to the manner of slicing the palmprint for testing purposes. Yet, again, in this one instance in the entirety of her career, Roadcap happened to render an opinion as to the medium of transfer. Roadcap admitted that she had no experience in fingerprint analysis to allow her to deduce on her own that blood in the valleys of the palm print meant a stronger case for the defense. However, Balshy had extensive training in fingerprint analysis and was on-site when the findings were deduced; thus, he could have easily informed Roadcap of the vulnerability of her initial conclusion. Therefore, we find Roadcap's statements that she simply assumed she was required to render an opinion as to the medium of transfer not credible.

Insofar as the conduct of the initial test, we find that Balshy was present in the room during the entirety of Roadcap's analysis of the subject palmprint evidence. We find that Balshy personally observed the positive results of the initial benzidine test and we adopt Roadcap's conclusion that Balshy would have seen exactly what she observed under

the microscope. We also note that we agree that at all times relevant, Balshy was an expert in the area of fingerprint examination and was qualified to analyze print evidence for the purpose of determining the medium of transfer.

OGC Op. at 31.

OGC also credited the testimony of former Deputy General Counsel Carusone, to the extent he related his interview of Roadcap concerning her discussions with Balshy and the fact Balshy "theorized" in Roadcap's presence as to the consequences of the conclusion that blood particles were detected in the valleys of the palm print. OGC Op. at 31. OGC rejected the testimony of Balshy and Roadcap that such conversation never occurred. OGC noted Carusone had no reason to misrepresent the substance of the conversation as this information jeopardized the Commonwealth's civil defense in the Crawford case. OGC indicated the record contained no "smoking gun" confirming an actual meeting of the minds between Roadcap and Balshy and a conspiracy to alter Roadcap's notes. However, OGC determined the alterations of Roadcap's notes and her arrival at the precise opinion Balshy sought was something more than a coincidence in light of the following facts:

- Balshy's continued presence in the room with Roadcap;
- Balshy's personal observations of the results of the benzidine test under the microscope;
- Balshy's expertise in matters of printing; and,
- Attorney Carusone's relation of Balshy's out-loud pontifications in the presence of Roadcap.

OGC Op. at 32.

In addition, OGC found it was Balshy's intention to direct Roadcap to alter her notes to conceal her original finding that blood was detected in the valleys and to render an opinion consistent with that alteration. OGC then stated: "Based on [these] conclusions, in particular, the credibility of Attorney Carusone and the fact that Roadcap's analysis would typically be limited to a determination of whether the substance in issue constituted 'human blood', i.e. she would not be required to render opinions as to the method of transfer, the substantial deviations in protocol in this case are consistent with Roadcap's statements to Carusone that she and Balshy discussed the nature and impact of the evidence in detail and that Roadcap obliterated her findings based on those discussions." *Id.* OGC also found Balshy concurred in Roadcap's conduct in concealing this evidence in light of the fact that he too concealed Roadcap's findings despite his own, direct observations of the results of the benzidine test.

OGC found Roadcap understood Balshy's intention and correspondingly altered her notes consistent with Balshy's theorizations. OGC also determined Roadcap's testimony that no conversations occurred concerning her initial findings and that she never communicated these findings was questionable. Specifically, OGC pointed to the fact the deceased Sgt. Simpson somehow had Roadcap's original notes in his possession, "thus confirming that some form of communication transpired between Roadcap and the investigators, specifically, the communication of Roadcap's original findings." OGC Op at 33.

Further, OGC stated, while Roadcap's note-taking methods may not have violated any written policy, Roadcap violated basic standards of honesty and truthfulness by intentionally obliterating relevant information from her notes. OGC noted Roadcap was quite disturbed when she learned her original notes were discovered because she made extraordinary efforts to assure her

conclusions would be concealed. OGC found, rather than simply crossing out her conclusions regarding the presence of blood in the valleys, a method she used in making other changes to the document, Roadcap went so far as to use a magic marker and completely obliterate these critical conclusions to assure no one would ever learn of her initial findings.

In delineating the conduct of Balshy and Roadcap it considered to be in bad faith, malicious and outside the scope of their employment, OGC explained (with emphasis added):

> Based on an analysis of the evidence within the context of this case, together with the opinions of former Dauphin County [Assistant] District Attorney Chardo, former PSP Deputy General Counsel Carusone and fingerprint expert MacDonell, the evidence in issue did constitute potentially exculpatory evidence. *The general question is not whether Roadcap and Balshy's opinions were ultimately supportable, it is whether they improperly withheld, individually or via conspiracy, evidence that could have potentially supported a viable defense in Crawford's case and whether their conduct in withholding and misrepresenting this evidence constitutes bad faith or malicious conduct or conduct outside the scope of their employment . . . .*

> It is not our intention to pursue an expert analysis or offer an ultimate conclusion as to the implication of each of Roadcap's findings; rather, our findings relate to the fact of Roadcap's withholding of information that would have been relevant within the context of a legal, criminal prosecution and corresponding efforts to pursue the cause and manner of Mitchell's death based on full and truthful information. *Not only did Roadcap exceed the proper scope of her*

*responsibility in rendering an opinion that she was not qualified to offer, she narrowed the scope of her disclosures of factual information and findings to suit her opinion—an opinion that may ultimately have been correct or accepted by the fact-finder. However, by concealing her initial findings, she subverted the legal process. None of the testimony, including expert testimony in any of the three criminal prosecutions, was based upon consideration of a finding of blood in the valleys of the subject palmprint.* As generally related by Detective Balshy in his testimony, such evidence could necessarily have compelled the conclusion that the palmprint was not deposited at the time of the murder. Given that this was the sole item of evidence placing Crawford in the garage at the time of the murder, based on our analysis of the record, the opinions of the Office of the Public Defender of Dauphin County, the Office of the District Attorney and the Office of General Counsel, this evidence was, as a matter of fact, potentially exculpatory evidence that should have been reported to the district attorney and the defense. Expert witness Herbert MacDonell was so surprised by the revelation of Roadcap's initial conclusions that he felt compelled not only to document his surprise, albeit at the urging of Crawford's counsel, he conducted several follow-up tests to further analyze this information. Unfortunately, he was without the benefit of the actual palmprint evidence, left only with photographs. Also, his efforts appeared to be limited to a determination of whether his original opinion was supportable, not to offer an opinion as to all possible conclusions that could be rendered. Nonetheless, he expressed great disappointment at Roadcap's conduct.

In addition to MacDonell, the Office of the District Attorney was so alarmed by

this discovery that it opened an investigation. While that office does not maintain that its decision to refrain from prosecuting Crawford a fourth time was based on the discovery of this evidence, it is not beyond the realm of possibility that this was indeed part of their consideration. Deputy General Counsel Carusone also expressly declared his shock at Roadcap's efforts and basis for withholding evidence.

*We cannot emphasize enough that Roadcap does not deny that she deliberately concealed and continually withheld this evidence. While her testimony is at times confusing, a recurring theme is that she acknowledges her initial discovery of blood in the valleys but that she intentionally concealed this information for the simple reason that it interfered with her ultimate conclusion as to the medium of transfer. Therefore, Roadcap's conduct was not inadvertent.*

*As regards Balshy's testimony, we note that Balshy tends to rely not only on Roadcap's conclusions, but in rendering expert opinions as to the medium of transfer, Balshy repeatedly relies on his own efforts in viewing the evidence under the microscope. As Roadcap opines, Balshy, a fingerprint expert, would have seen exactly what Roadcap saw under the microscope. Also, based on Carusone's testimony concerning Balshy's theorizations, there would have been no need for Balshy to so theorize unless he had information, whether through his own observations or Roadcap's, leading him to believe that blood may have been present in the valleys.*

*Further, through testimony in the criminal trials, Balshy is repeatedly questioned on whether the initial benzidine test yielded positive results in the valleys of the palmprint. Balshy repeatedly denies such a result, without qualification.*

*We therefore find that both Roadcap and Balshy testified in the three criminal trials of Steven Crawford in the full knowledge that blood may have been present in the valleys of the palmprint and that both Petitioners concealed and misrepresented this conclusion in their respective testimony.*

*Accordingly, based on the above, we find that both Roadcap and Balshy engaged in willful misconduct amounting to bad faith exercise of their authority and conduct outside the scope of their employment.*

OGC Op. at 34–38.

OGC then summarized four specific instances of misconduct by Balshy and Roadcap:

● Balshy's actions rose to the level of bad faith because he suggested that Roadcap change her test results to reflect no blood in the valleys of the palm print;

● Roadcap's actions amounted to bad faith to the extent she allowed Balshy's comments to influence her and to detract from her impartiality and sway her into manipulating her findings to help secure a conviction;

● Both Balshy and Roadcap acted in bad faith by failing to notify the district attorney and the defense of the original findings concerning the presence of blood in the valleys of the palm print; and,

● Both Balshy and Roadcap acted in bad faith by providing false or misleading testimony in the three Crawford criminal trials as to the existence of blood particles in the valleys of the palm print.

Upon review, we reject the arguments of Balshy and Roadcap that OGC's opinion is not supported by substantial evidence. Our review of the more than 1,500 pages of

reproduced record reveals ample support for the findings and determinations set forth in OGC's comprehensive opinion. *See* R.R. at 89a–90a, 98a–101a, 112a–114a (Crawford Criminal Trial # 1, Testimony of Balshy); R.R. at 126a–152a (Crawford Criminal Trial # 2, Testimony of Balshy); R.R. at 166a–198a (Crawford Criminal Trial # 3, Testimony of Balshy); R.R. at 238a (Roadcap's original, un-obliterated notes on PSP Request for Laboratory Services form); R.R. at 239a (Roadcap's obliterated notes on PSP Request for Laboratory Services Form); R.R. at 248a (Roadcap's official typewritten laboratory report); R.R. at 259a–326a (Roadcap's 2002 deposition); R.R. at 331a–346a (Crawford Criminal Trial # 1, Testimony of Roadcap); R.R. at 358a–372a (Crawford Criminal Trial # 2, Testimony of Roadcap); R.R. at 403a–438a (Crawford Criminal trial # 3, Testimony of Roadcap); R.R. at 630a, 634a–636a (Testimony of Assistant District Attorney Chardo before Hearing Officer Lutz); R.R. at 664a–671a (Testimony of Deputy General Counsel Carusone before Hearing Officer Lutz); R.R. at 702a–703a (Testimony of Harry Fox, III before Hearing Officer Lutz); R.R. at 734a–737a, 744a–747a, 754a–755a (Testimony of Roadcap before Hearing Officer Lutz); R.R. at 818a–823a (Testimony of Balshy before Hearing Officer Lutz); R.R. at 1186a, 1234a, 1260a–1261a (Deposition of Herbert MacDonell); R.R. at 1297a–1298a (Affidavit of Herbert MacDonell). Viewing this evidence in a light most favorable to the PSP as the prevailing party, *Bosnjak,* we conclude that OGC's necessary findings and determinations are supported by substantial evidence. Further, OGC's express consideration and rejection of the testimony of Balshy and Roadcap does not constitute capricious disregard. *Nevling.*

In sum, the arguments presented by Roadcap and Balshy invite this Court to reweigh the evidence and revisit OGC's credibility determinations, which we cannot do. *Aloe Coal; Herbert R. Imbt; Loffredo.* Therefore, we reject these arguments.

Based on the foregoing, the order of OGC is affirmed.

### ORDER

**AND NOW,** this 8th day of February, 2010, the order of the Office of General Counsel is **AFFIRMED.**

DISSENTING OPINION BY Judge PELLEGRINI.

I respectfully dissent from the majority's decision to uphold the General Counsel's determination[1] that John C. Balshy (Balshy) and Janice Roadcap (Roadcap) were not entitled to indemnification for costs of settlement and counsel fees because 42 Pa.C.S. § 8525[2] places exclusive

---

1. Although none of the parties raised the issue of subject matter jurisdiction until ordered to do so by this Court, the issue of subject matter jurisdiction is never waived, and a court may raise it *sua sponte. Borough of Jenkintown v. Hall,* 930 A.2d 618, 626 n. 7 (Pa.Cmwlth. 2007); *West Mifflin Area School District v. Board of Property Assessment Appeals,* 844 A.2d 602, 605 n. 3 (Pa.Cmwlth.2004). After a panel heard this matter, we ordered supplemental briefs and it was argued en banc.

2. 42 Pa.C.S. § 8525 provides:

When an action is brought under this subchapter against an employee of the Commonwealth government, and it is alleged that the act of the employee which gave rise to the claim was within the scope of the office or duties of the employee, the Commonwealth through the Attorney General shall defend the action, unless the Attorney General determines that the act did not occur within the scope of the office or duties of the employee. In the latter case, if it is subsequently determined that the act occurred within the scope of the office or

jurisdiction in a "court" to make that determination.

In 2003, Steven Crawford (Crawford) filed an action under 42 U.S.C. §§ 1983, 1985 and 1986 against numerous parties, including the Commonwealth of Pennsylvania, other state officials and Balshy and Roadcap. Balshy and Roadcap both sought legal representation by the Commonwealth, which denied their request. They each then retained separate counsel. In the midst of trial, the Commonwealth reached a $1.2 million settlement with Crawford without any admission of liability.[3] Balshy and Roadcap each settled their individual liability for $1,000, also without an admission of liability.

Both Balshy and Roadcap sought reimbursement of the amount they paid to settle the case as well as reimbursement of their legal fees. Balshy's legal fees at that date totaled $107,385.85, and Roadcap's legal fees totaled $178,156.40. Both requests were denied by the Deputy General Counsel, and both parties appealed to the General Counsel and requested an eviden-

tiary hearing. At the hearing, both Balshy and Roadcap presented testimony that, if believed, would have shown that they were acting within the scope of their office or duties of their employment. The Commonwealth, through an attorney in the General Counsel's office, presented evidence that, if believed, would have shown that Balshy and Roadcap acted in bad faith and engaged in willful misconduct outside the scope of their employment. Based on the Hearing Officer's recommendation, the General Counsel denied both Balshy's and Roadcap's requests for reimbursement finding that their testimony was not credible.

The General Counsel began the portion of her adjudication entitled "Standard of Review" with three citations to Section 8525 of what is commonly known as the Sovereign Immunity Act.[4] However, she has since disavowed that portion of her adjudication and now contends that Section 8525 does not apply. She now argues that Section 8525 only applies to certain torts listed in Section 8522 of the Judicial

duties of the employee, the Commonwealth shall reimburse the employee for the expense of his legal defense in such amounts as shall be determined to be reasonable by the court. If an action is brought against a Commonwealth government employee for damages on account of injury to a person or property and it is not alleged that the act of the employee which gave rise to the claim was within the scope of his office or duties, and he successfully defends the action on the basis that the act was within the scope of his office or duties, and he has given prior notice to the Attorney General and the Attorney General has refused to defend the action, he shall likewise be entitled to the reasonable expenses of the defense.

3. Because the Commonwealth has Eleventh Amendment immunity and is not subject to money damages, the only possible reason for it to settle an action brought against it is if some state actor was guilty of an independent

negligence that the Commonwealth agreed to defend and indemnify. Otherwise, the Commonwealth could have been dismissed from the case as a matter of law leaving the state actors to their own devices. Thus, by the very act of settling with Crawford, the Commonwealth implicitly admitted that other state actors were entitled to a defense and indemnification by the Commonwealth; in other words, that their actions had been within the scope of their office or duties as Commonwealth employees. Instead, the Commonwealth agreed to pay the vast majority of the settlement, leaving Balshy and Roadcap liable for a nearly *de minimis* amount of damages when compared to the sum total of the settlement. The General Counsel argues that because the Joint State Government Report on Sovereign Immunity states that the Commonwealth did not intend to waive immunity meant that it did not intend to waive Eleventh Amendment Immunity.

4. 42 Pa.C.S. §§ 8521–8527.

Code that relate to circumstances where the Commonwealth has waived its sovereign immunity. Because the action for which Balshy and Roadcap sought indemnification and counsel fees was brought under 42 U.S.C. § 1983, the General Counsel contends that it is governed only by 4 Pa.Code 39.3(b)(1),[5] a regulation that gives her the authority to make the initial decision whether to offer the employee a defense and then, after a hearing, to determine whether her decision was right.[6]

Significantly, the General Counsel admitted at oral argument that if Section 8525 did apply, she lacked jurisdiction.[7] The determinative issue then is whether the method prescribed by the General Assembly in Section 8525 giving the court jurisdiction to determine whether an employee is entitled to be indemnified for counsel fees for tort actions applies to Section 1983 constitutional torts. If so, then the General Counsel lacked jurisdiction to hear this matter, and her decision must be vacated.

## I.

There is no dispute that indemnification for judgments and court costs for actions brought under 42 U.S.C. § 1983 are available to local government employees under 42 Pa.C.S. §§ 8547 and 8548 of what is commonly known as the Political Subdivision Tort Claims Act (Tort Claims Act), the analogous provisions to Section 8525, which governs commonwealth employees. It is also clear that under Sections 8547 and 8548, a court has to make the determination whether to order indemnification. In *Wiehagen v. Borough of North Braddock*, 527 Pa. 517, 594 A.2d 303 (1991), our Supreme Court held that a police officer was entitled to indemnification and attorney's fees pursuant to Section 8548 for compensatory damages, attorney's fees, costs and expenses awarded to a plaintiff in a federal civil rights action. The plaintiff brought a 42 U.S.C. § 1983 action against a police officer and the municipality based on the officer's use of excessive force in arresting him for public intoxication. A federal jury awarded the plaintiff compensatory damages, finding that the officer, Wiehagen, used more force than necessary while acting within the scope of his duties. Officer Wiehagen brought suit seeking indemnification from the municipality under Section 8548(a) of

---

5. Section 39.3(b)(1) provides:

   If the General Counsel or the General Counsel's designee determines that the defendant's conduct was *a bad faith exercise of his authority, malicious or outside the scope of his employment, the General Counsel, in his sole discretion*, will determine whether the Commonwealth will undertake the defense of the defendant. The Commonwealth will not indemnify the defendant for a judgment against him, and will notify the defendant that he may be subject to personal liability and should engage his own attorney.
   (Emphasis added.)

6. No argument has been made that there was an impermissible comingling of functions. *See Lyness v. State Board of Medicine*, 529 Pa. 535, 605 A.2d 1204 (1992).

7. An analysis of Section 8525 leads inescapably to the conclusion that it vests original jurisdiction in a "court." Section 8525 provides for mandatory reimbursement of legal fees and for costs for any Commonwealth employee whose action was within the scope of the office or duties of the employee, a very broad standard. It also provides that the defense reimbursement should be determined by a "court."

   While Section 8525 is silent as to reimbursement for the employee's damages, presumably reimbursement for damages flows automatically from the reimbursement for legal fees through basic agency law because a determination to reimburse legal fees is an admission by the Commonwealth that the employee's actions were within the scope of his office or duties of the employee.

the Tort Claims Act. As here, the municipality argued that it was required to indemnify an employee only when his conduct fell within one of the eight exceptions to governmental immunity set forth in 42 Pa.C.S. § 8542(b) (here, in 42 Pa.C.S. § 8522). Because Officer Wiehagen's conduct did not fall under one of the eight exceptions, the municipality, just as the General Counsel does here, contended that it had no duty to indemnify the police officer.

In rejecting that claim, our Supreme Court stated:

> We first note that Section 8548 does not limit the amount of indemnification in any manner, but rather provides that the "local agency shall indemnify the employee for the payment of any judgment on the suit." In fact, through Section 8548(b) the Legislature has actually gone as far as to provide that the employee shall not even be liable for any expenses or legal fees incurred by the local agency during the employee's defense. These factors alone should be sufficient to compel the conclusion that the Borough is liable to indemnify Wiehagen for the entire judgment, which obviously fulfills the Legislature's purpose of providing a job environment free from the risk of personal liability. However, the Borough argues that 42 Pa.C.S. § 8553(c), which limits the type of damages recoverable under the Act, does not provide for the recovery of attorney fees, costs, and expenses, and that Wiehagen was therefore not entitled to indemnification for this portion of the judgment against him. We disagree.

> Section 8553(c) limits damages in actions brought pursuant to the Act, which seek damages. The case sub judice is an indemnification action, which is not an action for damages under the Act, and thus, is not subject to the damage limitations set forth in Section 8553. The original action for damages that serves as the basis for the within indemnification action was brought pursuant to 42 U.S.C. § 1983, not the Act.

> In addition, 42 Pa.C.S. § 8547 provides further evidence of the Legislature's intent that Wiehagen and others similarly situated suffer no financial loss while defending acts performed within the scope of their employment. Section 8547 actually obligates local agencies in these circumstances to defend the action on behalf of the employee or reimburse the employee for reasonable expenses incurred in defending the action, and as noted above, the employee is not liable for any expenses or attorney fees thereby incurred by the local agency pursuant to Section 8548(b). **We are equally convinced that the legal assistance provided for in Section 8547 extends to federal actions in the same manner as the indemnification provided by Section 8548.**

*Wiehagen,* 527 Pa. at 523–24, 594 A.2d at 306. (Emphasis added.) The Court then ordered that the matter be submitted to a court to make a determination as to the amount of fees and damages. *See also Renk v. City of Pittsburgh,* 537 Pa. 68, 641 A.2d 289 (1994); *Pettit v. Namie,* 931 A.2d 790, 801 (Pa.Cmwlth.2007); *Kuzel v. Krause,* 658 A.2d 856 (Pa.Cmwlth.1995).

While it is clear that local government employees are entitled to indemnification for damages arising out of and counsel fees incurred in defending a Section 1983 action under Sections 8547 and 8548 of the Tort Claims Act, the question is whether commonwealth employees enjoy the same protection under Section 8525 of the Sovereign Immunity Act.

## II.

I recognize that there are differences between the indemnification provisions

governing local government employees under the Tort Claims Act and commonwealth employees under the Sovereign Immunity Act. The most pertinent difference is that Section 8548 of the Tort Claims Act does not limit the type of action for which a local government employee is entitled to indemnification, only stating that it applies "[w]hen an action is brought against an employee of a local agency for damages on account of an injury to a person or property." Section 8525 of the Sovereign Immunity Act is different in that it states that "[w]hen an action is brought under this subchapter [Sovereign Immunity Act] against an employee of the Commonwealth government," the employee is entitled to indemnification. The General Counsel argues that this difference in language takes representation and indemnification for Section 1983 actions outside Section 8525 of the Sovereign Immunity Act because a federal action was obviously not brought under the Sovereign Immunity Act.

Before getting to the General Counsel's contention, it may first be useful to explain what a Section 1983 action is. Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ... 42 U.S.C. § 1983.

However, a Section 1983 action does not create any substantive rights, but rather serves merely as a "vehicle or ... 'device' by which a citizen is able to challenge conduct by a state official whom he claims has deprived or will deprive him of his civil rights." Harry Blackmun, *Section 1983 and Federal Protection of Civil Rights— Will the Statute Remain Alive or Fade Away?*, 60 N.Y.U.L.Rev. 1, 1 (1985); *Balent v. City of Wilkes-Barre*, 542 Pa. 555, 564–65, 669 A.2d 309, 314 (1995) (quoting *Urbanic v. Rosenfeld*, 150 Pa.Cmwlth. 468, 616 A.2d 46 (1992)). In other words, it is just a form of action.

Section 1983, though, is to be interpreted "against the background of tort liability that makes a man responsible for the natural consequences of his action" to create a "constitutional tort without a showing of specific intent." *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Common law or statutory torts that would not have been actionable under the Tort Claims Act or Sovereign Immunity Act become converted into constitutional torts through Section 1983. For example, the torts of assault, battery or wrongful death, which are not maintainable under the Tort Claims Act or Sovereign Immunity Act, can become maintainable under those Acts through Section 1983 as a denial of due process by summary infliction of punishment. Similarly, negligently failing to provide medical care to a person in custody becomes actionable through Section 1983 under the Eighth Amendment's cruel and unusable punishment provision. In short, Section 1983, as a constitutional tort, overlaps the conduct that is covered by the Sovereign Immunity Act.

Going back to the General Counsel's contention that Section 8525 of the Sovereign Immunity Act does not provide indemnification because a Section 1983 lawsuit is not "an action brought under [the Sovereign Immunity Act]", that initial clause is problematic because it cannot mean what it says. The Sovereign Immunity Act does not provide for a cause of action, but instead only provides an affirmative defense to those actions that do not

fall within one of the exceptions to immunity. In other words, the phrase cannot be taken literally because there is no such thing as a cause of action for sovereign immunity. Rather, all actions seeking recovery against a governmental party are brought in the form of a civil action or some available statutory form of action, and then sovereign immunity is pled as a defense. Therefore, if we were to interpret this provision as the General Counsel suggests, it would mean that *no* employee's damages or counsel fees *could ever* be indemnified under Section 8525 because *no* actions are ever brought under the Sovereign Immunity Act.

It could be argued that an action is "brought" under the Sovereign Immunity Act when the action falls under one of the exceptions to immunity. However, besides already being rejected in *Wiehagen,* that position would lead to situation where sovereign immunity is pled and the action is dismissed that a commonwealth employee could not recover counsel fees. For example, if a state trooper is sued for negligence for shooting an innocent bystander when the trooper intended to shoot an actor engaged in a violent felony, the action would not have been "brought" under the Sovereign Immunity Act because that conduct does not fall within any of the exceptions to immunity. No one would argue that if the Attorney General initially refused to defend an action based on those facts brought against the state trooper, the procedure set forth in Section 8525 would not be applicable to determine whether an employee is entitled to counsel fees if that action was dismissed.

Similarly, just because the form of the action is under Section 1983 does not mean that Section 8525 does not apply to determine whether damages and counsel fees should be indemnified for conduct that would otherwise fall within one of the exceptions or subject to the defense of sovereign immunity. For example, the same conduct described above involving the shooting of a bystander could give rise to the bringing of a constitutional tort under Section 1983, perhaps under a deliberate indifference standard, subjecting the state trooper to personal liability. The purpose of Section 8525 is to provide commonwealth employees a job environment free from the risk of personal liability and to provide that a court make the determination whether indemnification should be permitted, not within the "sole discretion" of the General Counsel or the Attorney General whose interests may be adverse.

Because Section 1983 overlaps conduct covered by the Sovereign Immunity Act, I would hold that the procedure set forth in Section 8525 of the Sovereign Immunity Act for indemnification applies to all actions where a commonwealth employee is subject to personal monetary liability when acting within the scope of his or her office, including constitutional torts brought under Section 1983. Because that procedure mandates that a "court" determines whether a commonwealth employee should be reimbursed for counsel fees and damages, I would vacate the General Counsel's order because she lacked subject matter jurisdiction to make that determination. Accordingly, I respectfully dissent.