Troiani Group and Troy Development    :
Associates, L.P.,    :
               Appellants    :
    :
           v.    :
    :
City of Pittsburgh Board of Appeals    :    No. 86 C.D. 2021
and City of Pittsburgh    :    Argued: May 13, 2021

BEFORE:    HONORABLE ANNE E. COVEY, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE ELLEN CEISLER, Judge

OPINION BY
JUDGE COVEY                            FILED: July 1, 2021

        Troiani Group and Troy Development Associates, L.P. (collectively, Troiani) appeal from the Allegheny County Common Pleas Court's (trial court) January 11, 2021 order affirming the City of Pittsburgh (City) Board of Appeals' (Board) September 18, 2020 decision that denied Troiani's appeal from the Department of Permits, Licenses, and Inspections' (PLI) denial of an emergency demolition plan (Demolition Plan) for Troiani's building located at 209 First Avenue in the City (First Avenue Structure), and three other Troiani-owned buildings located in the City at 100/102 Market Street, 104 Market Street and 106/108 Market Street (Market Street Structures), which abut the First Avenue Structure. Troiani presents two issues for this Court's review: (1) whether the Board erred as a matter of law when it refused to approve Troiani's Demolition Plan; and (2) whether the Board

misstated, and failed to apply, the proper standards under the Uniform Construction Code (UCC).[1]

The First Avenue Structure is a 6-story building with a basement, which has been vacant for approximately 50 years. The Market Street Structures are 2- to 4-story buildings that have been vacant since the early 2000s. In April 2020, due to its deteriorating condition, Troiani sought PLI's approval for emergency demolition of the First Avenue Structure (Emergency Demolition Application). On May 5, 2020, PLI's Assistant Director of Construction and City Building Code Official David Green (Green) denied the Emergency Demolition Application. Troiani appealed from PLI's denial to the Board. On June 26, 2020, after a hearing, the Board reversed PLI's denial of the Emergency Demolition Application and authorized the immediate emergency demolition of the First Avenue Structure. Troiani retained structural engineers and demolition experts to prepare the Demolition Plan. Thereafter, Troiani submitted its Demolition Plan for the First Avenue Structure to PLI. Troiani's Demolition Plan indicated that the Market Street Structures' demolition was necessary to safely demolish the First Avenue Structure. Accordingly, the Demolition Plan provided for demolition of the First Avenue Structure and the Market Street Structures.[2]

---

[1] 34 Pa. Code §§ 401.1-405.42. The Pennsylvania Supreme Court explained:

> The Pennsylvania Construction Code Act (PCCA), [Act of November 10, 1999, P.L. 491, *as amended*,] 35 P.S. §[§] 7210.101[-7210.1103], stresses uniformity: "[t]he way to insure uniform, modern construction standards and regulations throughout this Commonwealth is to adopt a [UCC]." [Section 102(a)(3) of the PCCA, 35 P.S.] § 7210.102(a)(3). Section 301 of the PCCA granted the Department of Labor and Industry authority to promulgate uniform statewide construction standards, *id*., § 7210.301(a)(1), which it did by adopting the UCC in April[] 2004.

*Schuylkill Twp. v. Pa. Builders Ass'n*, 7 A.3d 249, 250 (Pa. 2010).

[2] The trial court's affirmance of the City Planning Commission's August 18, 2020 decision denying Troiani's Project Development Plans for the Demolition of the Market Street Structures

2

By September 3, 2020 letter, Green notified Troiani that PLI denied the Demolition Plan. Green stated therein:

> 1. This review is for the demolition of [the First Avenue Structure] only. Demolition of [the Market Street] [S]tructures need[s] to be addressed under their respective permit applications. These applications are:
>
> a. DP-2019-03315: 106/108 Market [Street].
>
> b. DP-2019-03314: 104 Market [Street].
>
> c. DP-2019-03311: 100/102 Market [Street].
>
> 2. Please note that the demolition of [the Market Street Structures] requires approval from the [City's] Planning Commission [(Planning Commission)]. As it stands, the Planning Commission has denied the demolition of these structures. PLI has no direct authority to grant the demolition of these structures. Additionally, while the contract for demolition identifies demolition of these structures, this permit will be limited to demolition of [the First Avenue Structure].
>
> The submitted documentation shall be revised to establish a plan for the demolition of [the First Avenue Structure] that does not include the demolition of adjacent structures. You may appeal PLI's decision to the [Board]. . . .
>
> 3. Your engineer proposes that protection measures related to the demolition of [the First Avenue Structure] include the demolition of [the Market Street Structures]. Please note[,] as discussed[,] these types of measures are not required by the [*International Building Code of 2015* (Building Code)[3]] and it is not standard industry practice to demolish adjacent structures as a protection measure. Further, [Chuck] Cornely [(Cornely)] has identified that vibrations from demolition of the adjacent structures could cause the collapse of [the First Avenue Structure] and that

_____

is the subject of a separate appeal at Docket No. 85 C.D. 2021, argued seriately with the instant appeal.

[3] Section 403.21 of the UCC, 34 Pa. Code § 403.21, in pertinent part, adopted the provisions of Chapters 2-10, 12-29 and 31-35 and Section 3006 of the Building Code.

> the fall zone into Market Street is the same whether the Market Street [Structures] are demolished first or not. Given the above, PLI does not deem demolition of the Market Street [Structures] a necessary protection measure.

Reproduced Record (R.R.) at 190a-191a. Troiani appealed to the Board from PLI's decision.

The Board conducted a hearing on September 15, 2020. Troiani presented testimony from structural engineers Cornely and Dirk Taylor (Taylor) and demolition contractor Tim Schaaf (Schaaf).

Cornely drafted the Demolition Plan for the First Avenue Structure. He testified: "The demolition of the buildings along Market Street will reduce the potential for damage to the buildings across Market Street and reduce the potential for life [sic] and increased life safety for people using Market Street and people in the buildings across Market Street." R.R. at 242a. Specifically, Cornely confirmed that "[t]**he only means to minimize the life safety concerns for a controlled demolition of** [the] **First Avenue** [**Structure**] **is to first demolish the Market Street** [**Structures**]." R.R. at 244a (emphasis added). He reasoned that "[e]liminating these, demolishing these buildings on the east side of Market Street will absolutely reduce the risk of damage to the buildings on the west side of Market Street . . . ." R.R. at 248a.

Cornely explained:

> [There's] an 8[-]foot alley between [the First Avenue Structure] and the rear walls of the buildings along Market Street. That alley, the width of that alley precludes any kind of protection of the buildings along the east side of Market Street. It's all part of a convoluted situation of risk of actually fairly big proportions. The reducing of risk to the buildings on the west side of Market Street by demolishing the buildings on the east side of Market Street is, in my opinion, a very good move to limit damage from the potential uncontrolled and unexpected collapse of [the

4

First Avenue Structure] to the west and onto the buildings along the east side of Market Street.

R.R. at 249a.

When asked why the First Avenue Structure could not be brought down without falling to the west, Cornely expounded:

> The situation is this [-] [t]he wall that we see on the first floor, the first floor brick bearing wall with the brick courses, brick wythes [are] missing on the exterior of that wall, that wall has approximately . . . .
>
> . . . .
>
> 60[%] of its strength. The point is it's very weak. In addition to that, those bricks that are exposed along that first floor west bearing wall are, they are not stable. Any disturbance, any vibration can further remove the brickwork in that wall. That can happen at any time.
>
> That's what's got me so excited myself because it's like a straw that will break the camel's back. If you do work inside that building, you're liable to disturb that brick and displace that brick because of the deteriorated mortar in that brickwork of that first floor. That's why it's dangerous. This is something that's incipient. Any vibration may be the straw that breaks the camel's back.

R.R. at 250a-252a.

Taylor testified that he reviewed Cornely's assessment and the Demolition Plan. *See* R.R. at 218a. *Taylor related that he visited the buildings, reviewed the interior and exterior conditions of the First Avenue and Market Street Structures, and based on his observations, investigation and analysis, he concurred with Cornely's documents*. *See id.* Taylor described:

> [I]f [the First Avenue Structure] . . . falls on top of [the Market Street Structures], depending on the manner of the fall and how much of the [First Avenue Structure] is left, it is most likely to -- it under certain circumstances could actually end up creating pressure within the building with a correct blast that would not only push the buildings[]

5

over[,] but could also end up projecting portions of the front wall outward as a result of that interior pressure that could build up under certain collapse circumstances.

R.R. at 227a-228a.

Taylor confirmed that "it is extremely likely that the impact from a collapsing taller building at [the First Avenue Structure] falling onto the roofs of [the Market Street Structures] would push these buildings onto and possibly even across Market Street and First Avenue, presenting a major danger to public safety and likely causing significant property damage[,]" and that the pressure could project pieces of brick, glass and timber-like shrapnel. R.R. at 228a. Taylor concluded:

> In my opinion, based on the condition of the lower west wall, the most heavily loaded portion of that wall, and looking at the conditions throughout all the floors in the building at [the First Avenue Structure], I feel that the risk is extremely high that under any reasonable demolition circumstance, there's a very high risk that that's going to fail no matter what's done . . . . My feeling is that there is a high likelihood that no matter what's done, that building is going to end up collapsing based on its current condition.

R.R. at 233a.

When asked if it was possible to shore up the First Avenue Structure to remove the deteriorating west wall, Taylor responded:

> Because there is so little lateral instability in there, I would not feel safe being involved in any kind of a shoring system that would unload that wall. There is no measurable lateral stability in that building, in my opinion, right now. The front wall of the building is all glass. The back wall is propped up with windows and things like that. It's also cracked and severely deteriorated. All the beam connections to the wall at every floor, the beams are shrunk, the beams are rotted. There's no mechanical connections between the beams and walls. It's all friction. **It's 150[-]year-old or 100[-]year-old friction connections that are all failed and inadequate**. **It's my opinion there is no measurable lateral stability**. **Which**

6

> **is why I would not put a shoring crew in there**, **based on the conditions that I have seen**.

R.R. at 233a-234a (emphasis added).

Schaff described the usual demolition method for buildings like the First Avenue Structure, as follows:

> Conventionally, a building of this size and this nature, the way that it's structured, we would take the top of the building off. Our Stage 1 would be to go inside and pull the floors around the perimeter walls from the inside approximately 3 foot inward of the building, which would give us somewhere to drop the brick from the top of the building down to the basement. That's not possible with this building because there is not an engineer out there that we found that would sign off on a plan to put our guys inside that building because of the possibility of collapse.

> Our second option would be to go to the top of the building, which is part of Phase 2 of the [D]emolition [P]lan, and take some weight off of that wall. Once again it poses the same factor, that any brick that comes from the top of the building, anything that falls down to the bottom, because that alleyway is only 8 foot [sic] wide at the bottom, and the building overhangs, there's only 6 foot [sic], so any brick that falls doesn't necessarily fall straight down. They fall outward. The buildings along Market Street are in such bad condition that even a handful of brick that hit [the] back of those buildings are going to cause the rear brick facades of [the] Market Street [Structures] to collapse into the building along First Avenue. At that point, we have guys right there. I don't want anybody getting killed there.

> As the City Solicitor stated, we are mobilized. We are one of two companies in the Pittsburgh area that can even reach a building of that magnitude. We have a high-reach excavator onsite. Buildings this size are not meant to be let go this long and be able to be a controlled demolition on the way down. It's a high risk from our end because [] this building is going to be top heavy.

> The way that we take the buildings apart is basically the way they were constructed. The wooden beams serve as

7

our support from east to west.  We will go through and systemically take those out on the way down from top to bottom.  You have a certain level of vertical support that needs to be maintained throughout demolition.  When you have all that weight up top, and you have no support at the bottom, it's pretty much almost a failure situation[].  We can take as much care.  We can try.

R.R. at 253a-255a.  Schaff cautioned:

[The First Avenue Structure demolition] has been running through our head[s] for two years now, these buildings, which way to get those down safely, with or without the Market Street [Structures].  When I was made aware of the [Board's] decision to take down [the First Avenue Structure] and not [the] Market Street [Structures], **it's the first time in my career that I just didn't have all the answers to it**.  **I looked back at the engineers**.  **The engineers confirmed my suspicions**.

R.R. at 255a (emphasis added).

In contrast, Green testified in support of PLI's denial of the Demolition

Plan, explaining:

[T]his proposal . . . exceeds the code required protection measures as prescribed by both the Building Code, as well as [the] Pittsburgh City Code.  A reminder that the [B]uilding [C]ode official is charge[d] with determining what adequate protection measures are.  Secondarily noting that, additionally, this protective measure of demolishing adjacent structures is not an industry practice.  It's not atypical for a structure to have to be demolished on a tight, urban infill site.  I would further note that[,] while the property owners have the luxury of site control, if they did not have site control of the Market Street [S]tructures, I think this case and their options would be very different.  Ideally everyone would love to have site control.  You can't guarantee it.  Keep in mind that simply because they have site control doesn't mean that demolition of those structures is necessarily the appropriate measure for protecting the public.  Also noting that[,] in previous reports, [] Cornely . . . clearly identified that the demolition of these structures causes him

8

experience [sic] and can cause the demolition of, cause the collapse of [the First Avenue Structure].

R.R. at 299a-300a. Green concluded: "PLI has assessed what has been proposed and does not determine it to meet the standard that would indicate . . . that a clear and public imminent danger exists if the Market Street [S]tructures are to remain and [the First Avenue Structure] is demolished independently from those." R.R. at 315a-316a.

When asked whether structural engineers had given input in his decision to reject the Demolition Plan, Green responded:

> [W]hile ultimately the decision rests with me as [B]uilding [C]ode official, [Troiani's Demolition Plan] has been reviewed internally by both myself, who is an architect, other architects and [a] registered engineer on our staff. This was peer reviewed internally. Ultimately, the decision, due to my position in PLI as [B]uilding [C]ode official, **it is ultimately my determination**. All the internal staff who evaluated it agreed in terms of this assessment.

R.R. at 316a (emphasis added).

Concerning the testimony of PLI's staff, Green related:

> **We are not going to present that**. . . . [A]gain, **this is an assessment of an application made to PLI**. . . . [W]hile they may be registered, they are not providing assessment in a similar fashion to what [] Cornely or [] Taylor have done. **Our assessment is based on our experience and background in evaluating this type of application**. We get about 60 to 100 of these a year for commercial structure[s], demolition of structures. Applying these standards, what have we seen in our collective experience, what protection measures have been presented.

R.R. at 317a (emphasis added).

The Pittsburgh History and Landmarks Foundation's representative Karamagi Rujumba (Rujumba), and adjacent property owner Jay Green, also

9

testified on the City's behalf. After the hearing, the Board affirmed PLI's denial of the Demolition Plan, and issued its written decision on September 18, 2020 (Decision).

Troiani appealed to the trial court. On January 11, 2021, the trial court affirmed the Board's Decision. Troiani appealed to this Court.[4] On May 3, 2021, Troiani filed an Application to Request Judicial Notice and to Supplement the Record with the City's April 22, 2021 Condemnation Notice for the Structure at Issue (Motion to Supplement). Therein, Troiani averred that, on April 22, 2021, PLI posted "CONDEMNATION" notices (Condemnation Notices) on the First Avenue Structure and the Market Street Structures and issued "First Request for Compliance" notices (Compliance Notices) to Troiani for all of the structures, identifying the First Avenue Structure and the Market Street Structures as "**Unsafe Structures**" under the International Property Maintenance Code. Motion to Supplement at 2-3. *See also id.*, Attachments A, B (emphasis added). As corrective action, the Compliance Notices directed Troiani to: seek permits to protect the public right-of-way; "stabilize" the structures; and/or seek approvals for the structures' demolition from PLI and the Department of City Planning. *Id.* Troiani attached supporting photos of the Condemnation Notices and Compliance Notices as exhibits to its Motion to Supplement.

At argument before this Court on May 13, 2021, the City's counsel represented to the Court that the City did not oppose this Court taking judicial notice

---

[4] The standard of review in an appeal of a local agency decision, where the trial court has taken no additional evidence, is whether constitutional rights have been violated, whether an error of law has been committed, or whether a finding of fact of the agency necessary to support its adjudication is not supported by substantial evidence.

*Meyer v. City of Pittsburgh Historic Rev. Comm'n*, 201 A.3d 929, 935 n.6 (Pa. Cmwlth. 2019).

10

of the Condemnation Notices or the Compliance Notices. Accordingly, this Court grants the Motion to Supplement.

Initially, Troiani argues that the Board's Decision is inadequate to support its denial of the Demolition Plan. Specifically, Troiani contends:

> In its written [D]ecision, [the Board] identified the witnesses who had testified at the hearing but did not describe any of the testimony or evidence presented. The Board failed to articulate any reasoning and did not cite any evidence to support its [D]ecision.
>
> . . . .
>
> Without any reference to the evidence or the factors that are actually to be considered for "appeals," as set forth in [Section 403.122(f) of the UCC,] 34 Pa. Code § 403.122(f), or the standards for "variances" described in [Section 403.122(g) of the UCC,] 34 Pa. Code § 403.122(g), the Board summarily denied "the variance request." [R.R. at 352a-353a].

Troiani Br. at 21-22 (footnote omitted).

The entirety of the Board's Decision states:

**BUILDING DATA:**

Existing [6]-story building built of 5-wythe brick bearing walls on east and west sides and multi-wythe brick masonry on north and south sides with heavy timber wood framing at each floor and roof level spanning east-west. The building is comprised of 6 stories above grade with a basement. The building has been vacant for approximately 50 years.

**SUBJECT:**

The variance request is appealing the [Building] Code Official's decision or interpretation. The [Building] Code Official's September 3, 2020 decision was to deny the [] [D]emolition [P]lan for the [First Avenue Structure]. The [] [D]emolition [P]lan stated that the adjacent [Market Street Structures] needed to be demolished in order to demolish the [First Avenue Structure]. [Troiani]

11

presented testimony . . . as well as the proposed [D]emolition [P]lan dated August 11, 2020[,] provided by [] Cornely and an August 31, 2020 peer review report prepared by [] Taylor. PLI presented testimony from [] Green regarding his decision to not approve the [] [D]emolition [P]lan. Corey Layman[, Zoning Administrator for the Department of City Planning,] then presented testimony regarding the previous application for these building[s'] demolition to the [City] Zoning Board [of Adjustment]. Jay Green presented testimony regarding his previous experience with a building demolition project on the adjacent property. [] Rujumba then presented testimony regarding the proposed demolition of the Market Street [Structures] and the [First Avenue Structure] demolition. . . . It was noted that, per [UCC] [S]ection 403.122(f), the Board['s] decision[] on a variance which appeals the [Building] Code Official's decision or interpretation, is solely to decide whether the true intent of the [UCC] has been incorrectly interpreted.

**DECISION:** The Board denies the variance request. The vote was unanimous.

R.R. at 352a-353a.

Section 555 of the Local Agency Law requires that "[a]ll adjudications of a local agency shall be in writing, **shall contain findings and the reasons for the adjudication**, and shall be served upon all parties or their counsel personally, or by mail." 2 Pa.C.S. § 555 (emphasis added).

This Court has explained:

It is well[ ]settled that "the constitutional guarantees of due process apply equally to proceedings before administrative tribunals," and that "[t]he basic requirements of due process are notice and an opportunity to be heard." *Gow v. Dep't of Educ.*, 763 A.2d 528, 533 (Pa. Cmwlth. 2000). . . . Nevertheless, administrative proceedings "must comply with a different set of standards to satisfy due process requirements." *R. v. Dep't of Pub. Welfare*, . . . 636 A.2d 142, 144 ([Pa.] 1994). Those standards, set forth by our Supreme Court in *Peak v. Unemployment Compensation Board of Review*, . . . 501 A.2d 1383 ([Pa.] 1985), **require that the fact[]finder's**

12

**decision** be "subject to judicial review on the substantial evidence test" and **be explained** "**in sufficient detail to permit meaningful appellate review**." *Peak*, . . . 501 A.2d at 1389.

*Fisler v. State Sys. of Higher Educ., Cal. Univ. of Pa.*, 78 A.3d 30, 41 (Pa. Cmwlth. 2013) (emphasis added; footnote omitted).

> The absence of . . . a reasoned adjudication [can] preclude a court from conducting meaningful appellate review, thus implicating the constitutional guarantee of a "right of appeal . . . from an administrative agency to a court of record or to an appellate court . . . ." Pa. Const. art. V, § 9.

*Salters v. Pa. State Police Mun. Police Officers' Educ. & Training Comm'n*, 912 A.2d 347, 355 n.16 (Pa. Cmwlth. 2006).

At the Board hearing, Troiani's expert witnesses, who are structural engineers, gave detailed testimony supporting their opinions that the Market Street Structures' demolition was necessary for the safe demolition of the First Avenue Structure. According to Troiani,

> [a]s the only expert structural engineers to testify explained to the Board, the [] Demolition Plan requires, as Phase I, the demolition of the Market Street Structures, which are located on the adjoining property, only 8 feet from the First Avenue Structure. [*See* ]R.[R. at] []240a-[]341a[]. No option exists for demolishing the First Avenue Structure safely, without first demolishing the Market Street Structures. [*See* ]R.[R. at] []314a[]. If the First Avenue Structure falls on top of the Market Street Structures, the force of the collapse will send "shrapnel" of brick, glass and timber into and across Market Street, into occupied buildings. []R.[R. at] []229a[].

> The structural engineers described why controlled demolition of the Market Street Structures as Phase I of the [D]emolition [P]lan for the First Avenue Structure would effectively "remove the ammunition from the chamber," so that the potential projectiles would be collapsed into the basements of the Market Street

13

Structures.  R.[R. at] []248a-[]249a[].  With the demolition of the Market Street Structures, the First Avenue Structure can be more safely collapsed onto the Market Street [p]roperty, without the potential hazards of a collapse onto those other deteriorating structures and without causing damage to buildings across Market Street or First Avenue, or even worse, causing injury to nearby residents or pedestrians.[5]  [*See* ]R.[R. at] []10[a]-32a[].  As [] Taylor, the structural engineer who peer-reviewed the [Demolition] Plan[] warned, "trying to demolish the [First Avenue Structure] without first taking down the adjacent lower buildings on Market Street presents an unacceptable risk to public safety and property damage to the buildings located directly across Market Street."  []R.[R. at] []164a[].

Troiani Br. at 26-27.  Further, Troiani asserts that PLI "offered only the unsupported opinion of [] Green, who is not [an] engineer and who had not conducted any extensive inspection or analysis of the structures, in support of his denial of the [Demolition P]lan." *Id*. at 29.

"We have explained that [a capricious disregard of evidence] 'occurs where the fact[ ]finder willfully and deliberately disregards competent and relevant evidence that one of ordinary intelligence could not possibly have avoided in reaching a result.'" *Bertram v. Unemployment Comp. Bd. of Rev.*, 206 A.3d 79, 83 (Pa. Cmwlth. 2019) (emphasis added) (quoting *Wise v. Unemployment Comp. Bd. of Rev.*, 111 A.3d 1256, 1262 (Pa. Cmwlth. 2015)).

> [This Court] may conclude that **a fact[ ]finder has capriciously disregarded competent evidence "when the unsuccessful party below has presented 'overwhelming evidence' upon which the adjudicator could have reached a contrary conclusion**, **and the**

---

[5] Troiani acknowledges that the Building Code requires adjoining public and private properties be protected during demolition.  *See* Troiani Br. at 27-28.  Troiani nonetheless contends that the unique circumstances involving the First Avenue Structure's dangerous condition and Troiani's ownership of the adjoining properties are reasonable justifications for allowing a variance from the Building Code's provisions, especially where demolition of the Market Street Structures would protect other neighboring properties.  *See id*. at 28, R.R. at 114a, 121a.

14

> **adjudicator has not satisfactorily addressed that evidence** by resolving conflicts in the evidence or making credibility determinations that are essential with regard to the evidence." *Balshy v.* [*Pa.*] *State Police*, 988 A.2d 813, 835-36 (Pa. Cmwlth. 2010) (quoting *Grenell v. State Civ*[.] *Serv*[.] *Comm*[*'n*], 923 A.2d 533, 538 (Pa. Cmwlth. 2007)). "In other words, where there is strong 'critical' evidence that contradicts evidence supporting a contrary determination, the adjudicator must provide an explanation as to how it made its determination." [*Balshy*, 988 A.2d] at 836.

*Kiskadden v. Pa. Dep't of Env't Prot.*, 149 A.3d 380, 401 (Pa. Cmwlth. 2016) (emphasis added).

Here, the Board appears to have disregarded Troiani's "strong 'critical' evidence" quoted above, *Balshy*, 988 A.2d at 836, and "has not satisfactorily addressed that evidence." *Id.* at 835. Despite Troiani's expert witnesses' lengthy and detailed testimony supporting the Market Street Structures' demolition, the Board denied the Demolition Plan with no analysis or rationale supporting its adjudication. In its Decision, the Board simply described the First Avenue Structure and the decision under review, identified the witnesses who appeared, and provided non-specific overviews of the witnesses' testimony. There are no "findings and . . . reasons for the adjudication[.]" 2 Pa.C.S. § 555. The Board's denial is not "explained 'in sufficient detail to permit meaningful appellate review.'" *Fisler*, 78 A.3d at 41 (quoting *Peak*, 501 A.2d at 1389). In fact, it is not explained at all. Accordingly, this Court cannot conduct meaningful appellate review of the Board's Decision.

For all of the above reasons, this Court vacates the trial court's order and remands this matter to the trial court with direction that the trial court vacate the Board's Decision and expeditiously remand the matter to the Board to expeditiously issue a decision based on the existing record evidence consistent with this opinion.

_____
ANNE E. COVEY, Judge

Judge McCullough did not participate in the decision in this case.

16

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Troiani Group and Troy Development :
Associates, L.P., :
                Appellants :
                                          :
                v. :
                                          :
City of Pittsburgh Board of Appeals :    No. 86 C.D. 2021
and City of Pittsburgh :

## O R D E R

AND NOW, this 1st day of July, 2021, the Allegheny County Common Pleas Court's (trial court) January 11, 2021 order is VACATED, and the matter is REMANDED to the trial court with direction that it vacate the City of Pittsburgh (City) Board of Appeals' (Board) decision and remand the matter to the Board to issue a new decision based on the existing record evidence consistent with this opinion. Because time is of the essence, the trial court shall, within 7 days of the date of this Order, remand the matter to the Board and direct the Board to issue a new decision within 20 days of the date of the trial court's remand order. If, after the Board issues its new decision, an appeal is taken therefrom, the trial court shall expedite the briefing schedule and shall issue its decision within 30 days of the date of the filing of that appeal.

Troiani Group and Troy Development Associates, L.P.'s Application to Request Judicial Notice and to Supplement the Record with the City's April 22, 2021 Condemnation Notice for the Structure at Issue is GRANTED.

The Prothonotary of the Commonwealth Court is directed to immediately transmit the record to the trial court.

Jurisdiction is relinquished.

                                    _____
                                    ANNE E. COVEY, Judge